James E. Cecchi
*Pro Hac Vice* Forthcoming
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
Email: jcecchi@carellabyrne.com

Jeff Ostrow
*Pro Hac Vice* Forthcoming
**KOPELOWITZ OSTROW, P.A.**
One W Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
Email: ostrow@kolawyers.com

Gary M. Klinger
*Pro Hac Vice* Forthcoming
**MILBERG, PLLC**
227 W Monroe St, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
Email: gklinger@milberg.com

William Shinoff
**FRANTZ LAW GROUP, APLC**
*Pro Hace Vice* Forthcoming
402 W. Broadway
San Diego, CA 92101
Tel: (855) 735-5945
Email: wshinoff@frantzlawgroup.com

*Proposed Co-Lead Counsel for the Proposed School District Class and Counsel for Plaintiffs*

Tyler S. Graden
*Pro Hac Vice* Forthcoming
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
tgraden@ktmc.com

Charles H. Thronson (USB 3260)
**PARSONS BEHLE & LATIMER**
201 S. Main, Suite 1800
Salt Lake City, Utah 84111
Tel: (801) 532-1234
cthronson@parsonsbehle.com

*Additional Counsel for the Proposed School District Class and Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| **MOORE PUBLIC SCHOOLS,** individually and on behalf of all others similarly situated,<br><br>**Plaintiffs,**<br><br>**v.**<br>**INSTRUCTURE HOLDINGS, INC.; INSTRUCTURE, INC.; KKR & CO. INC.,**<br><br>**Defendants.** | **CLASS ACTION COMPLAINT**<br>**<u>JURY DEMANDED</u>**<br><br>Case No. ____________________ |

# TABLE OF CONTENTS

**Section** **Page**

INTRODUCTION ........................................................................................1

JURISDICTION AND VENUE ....................................................................6

PARTIES ....................................................................................................8

FACTUAL BACKGROUND.........................................................................9

A. INSTRUCTURE COLLECTED AND ENABLED ACCESS TO THE SCHOOL DISTRICTS' PROTECTED DATA .......................................10

B. INSTRUCTURE FAILED TO PROTECT THE SCHOOL DISTRICTS' PROTECTED DATA .............................................................................20

1. Instructure Had a Duty to Follow Regulatory Guidance and Industry-Standard Cybersecurity Practices..................................................35

*i. Instructure must comply with FTC guidance regarding safeguarding the School Districts' Data.......................................................35*

*ii. Instructure was contractually obligated to meet or exceed industry standards regarding its network security ...............................37*

2. Instructure Failed to Encrypt Data in Motion or Use for the School Districts ..........................................................................57

3. Instructure Failed to Implement Basic Security Controls to Protect the School Districts' Data and Detect the Breach...............................59

D. THE DATA BREACH WAS FORESEEABLE AND PREVENTABLE60

E. INSTRUCTURE PAID A FUTILE RANSOM IN AN ATTEMPT TO CONTAIN THE DATA, WHICH REMAINS SUBJECT TO ONGOING MISUSE BY HACKERS ...............................................................49

F. PLAINTIFFS AND CLASS MEMBERS HAVE BEEN HARMED....67

CLASS ALLEGATIONS ..........................................................................70

CAUSES OF ACTION .............................................................................77

COUNT 1: BREACH OF EXPRESS CONTRACT ....................................77

COUNT 2: NEGLIGENCE ....................84

COUNT 3: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ....................89

COUNT 4: UNJUST ENRICHMENT ....................92

COUNT 5: DECLARATORY AND INJUNCTIVE RELIEF ....................93

PRAYER FOR RELIEF ....................96

Plaintiff Moore Public Schools (together with additional schools and/or school districts to be named, "Plaintiffs"), individually and on behalf of the Nationwide Class and Statewide Subclasses, (as defined below, the "Classes") and members of the Classes (collectively, including Plaintiffs, the "Class Members" or "School Districts"), alleges the following against Defendants Instructure Holdings, Inc., and Instructure, Inc. (collectively, "Instructure") and KKR & Co. Inc. ("KKR" and, together with Instructure, "Defendants") based upon personal knowledge, the investigation of counsel, and information and belief as to all other matters:

## INTRODUCTION

1. This class action arises from Instructure's material and uniform breach of its contracts with thousands of School Districts across the United States. When the School Districts contracted to use Instructure's services, Instructure committed to securing their confidential data and communications using industry-standard cybersecurity protocols and to maintaining reliable, uninterrupted access to Instructure's Canvas learning management system ("Canvas"). Instructure failed to honor that critical and essential contractual undertaking. As a result, on or about April 25, 2026, a criminal extortion group of hackers - "ShinyHunters" - gained access to the Canvas platform and exfiltrated unencrypted data belonging to the School Districts. Thereafter, less than twenty-four hours after Instructure assured users that the incident had been "resolved," the ShinyHunters again gained unauthorized access to Canvas through the same vulnerabilities on May 7, 2026 (together with the April 25, 2026 attack, the "Data Breach" or "Breach"), locking the platform and

causing widespread Canvas outages and disruptions to educational operations nationwide. The 3.65TB of compromised data included highly sensitive and personally identifiable information ("PII" or "Private Information"), including confidential records containing, at a minimum, full names, student identification numbers, email addresses, billions of private Canvas messages exchanged among students, teachers, and faculty, and other unspecified Private Information (collectively, "Data" or "Protected Data"). The scale of the Data Breach is unprecedented and has been regarded as the largest security breach on record, severely affecting approximately 275 million users and 9,000 educational institutions, including approximately 40% of U.S. K-12 school districts and 50% of higher education institutions in North America.

2. The Data Breach was both foreseeable and preventable. The Breach and its consequences would not have occurred absent Instructure's failure to implement rudimentary data-security measures and to respond appropriately to known threats and vulnerabilities. Remarkably, Instructure had publicly acknowledged a separate cybersecurity incident, reportedly involving the same threat actor, just eight (8) months earlier. Despite knowing that sophisticated cybercriminals had previously targeted it, and despite the heightened sensitivity of the student educational records and PII entrusted to it, Instructure failed to implement the basic, expected, and promised safeguards necessary to prevent another compromise of its systems. The Data Breach was therefore the foreseeable consequence of Instructure's failure to adequately secure its systems and the Private Information maintained therein.

3. Despite Instructure's repeated public representations regarding its purportedly sophisticated monitoring and incident-response capabilities, and despite its concrete awareness of the specific threat actor, Instructure failed to detect the initial intrusion for several days after the unauthorized access began. During that period, ShinyHunters accessed and exfiltrated vast troves of sensitive student and educational data, while Instructure provided little to no meaningful public information regarding the scope or severity of the incident because of its delayed detection. After days of uncertainty and disruption, Instructure publicly represented that the incident had been "resolved," only for ShinyHunters to regain unauthorized access to Canvas the very next day. The second intrusion forced Instructure to place Canvas into "maintenance mode," causing widespread shutdowns and outages for schools and universities across the country during one of the most critical academic periods of the year. As a result, numerous schools were reportedly forced to postpone or cancel examinations, assignments, and other academic functions. At the same time, students, educators, and administrators suddenly lost access to coursework, exams, grading systems, communications, and other essential educational services hosted on Canvas.

4. School districts throughout the nation rely on Canvas as an essential educational platform through which coursework, assignments, grades, attendance information, and private day-to-day communications are transmitted and maintained. For many school districts, Canvas is deeply integrated into ordinary educational operations and necessarily required schools, students, teachers, and staff to entrust Instructure with

substantial quantities of sensitive Private Information. Instructure expressly and impliedly promised Plaintiffs that it would implement and maintain reasonable, industry-standard data-security safeguards to protect the Private Information stored within Canvas. Those representations were paramount to Plaintiffs' and Class Members' decisions to contract with Instructure, use Canvas, and permit Instructure to collect, process, store, and maintain highly sensitive information and communications through its platform.

5. To Plaintiffs' and Class Members' dismay, Instructure failed to honor these commitments. Instructure consistently failed to implement and maintain reasonable, industry-standard data security measures commensurate with the volume, sensitivity, and legal significance of the information entrusted to it. As a result, ShinyHunters was able to access Instructure's systems, exfiltrate massive quantities of Private Information, and publish a ransom demand threatening to release data from nearly 9,000 educational institutions and approximately 275 million users unless Instructure paid the ransom.

6. The consequences are particularly severe, as the compromised information included billions of private personal messages among students, teachers, and staff, full names, student identification numbers, usernames, email addresses, and other presently unknown PII. These consequences are magnified given that the full scope of the Data Breach and Private Information released is yet to be revealed. Namely, the *billions* of unencrypted private messages stolen from Canvas could contain virtually any category of Private Information shared through the platform. Moreover, the second unauthorized access and resulting outage demonstrated that the harm extended beyond data exfiltration

alone and materially disrupted educational operations nationwide at a time when end-of-semester activities were in full swing, with final exams being administered, semester-long projects due, and grades being finalized.

7. Although Instructure reportedly paid a ransom in exchange for ShinyHunters' purported agreement to delete the stolen data, that effort was inherently futile and did nothing to remedy the harms already inflicted upon Plaintiffs, Class Members, students, educators, and families nationwide. By then, the Data Breach had already resulted in the unauthorized exfiltration of unprecedented volumes of Private Information, widespread disruption to educational operations, and the shutdown of critical educational services during final examinations and end-of-semester activities. Nor did that effort eliminate the future harms that remain. As federal law enforcement agencies have repeatedly warned, paying cybercriminal ransom demands provides no assurance that stolen data will actually be deleted, returned, or not further disseminated. To the contrary, cybercriminals frequently retain, sell, trade, and/or leak stolen data notwithstanding assurances to the contrary.

8. Indeed, schools and universities across the country have continued to warn students, faculty, and families to remain vigilant against phishing attempts, social engineering schemes, fraudulent activity, credential attacks, and other misuse of compromised information stemming from the Data Breach. Moreover, Instructure's premature assurances that the incident had purportedly been "resolved," which were quickly belied by ShinyHunters renewed unauthorized access, together with Instructure's failure to provide complete and consistent information regarding the scope of the Data

Breach, further undermines any confidence that Plaintiffs and Class Members can reasonably place in Instructure's representations regarding the security of the stolen Data or the ultimate extent of the Breach. Accordingly, Plaintiffs, Class Members, and all Canvas users remain subject to ongoing and substantial risks arising from the Data Breach.

9. Through this action, Plaintiffs and Class Members seek to recover all damages available at law and equity arising from Defendants' misconduct, including economic damages, as well as injunctive and declaratory relief compelling Instructure to upgrade, enhance, and improve its cybersecurity and incident-response practices, and to maintain such improvements. The economic relief sought includes all damages naturally flowing from Instructure's breaches of contracts and negligence, including, *inter alia*, overpayment and benefit of the bargain damages, damages arising from operational disruption and loss of access to Canvas, and compensation for the time, labor, and resources School Districts were required to divert in responding to the Data Breach, restoring educational continuity, communicating with affected students and families, and mitigating the ongoing harms caused by the Breach.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds $5,000,000, there are more than 100 proposed Class Members, and minimal diversity exists, and Defendants are citizens of states different from that of at least

one Class Member. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

11. This Court has personal jurisdiction over Instructure because it regularly conducts business in Utah and its headquarters is located in Utah.

12. This Court also has personal jurisdiction over KKR. As discussed below, KKR purposefully directed its activities toward Utah and availed itself of the benefits and protections of Utah law, based on its acquisition-related contacts with Utah and operational control over a Utah company. Specifically, on July 25, 2024, Instructure announced it was set to be acquired by KKR, a deal that was ultimately finalized on November 13, 2024. Further, Plaintiffs' claims arise out of KKR's activities in Utah.

13. This Court's exercise of jurisdiction over KKR is reasonable and comports with fair play and substantial justice. First, KKR's entry into Utah was extensive: it negotiated a multibillion-dollar acquisition of a Utah-headquartered company following two years of due diligence, thereby making Instructure a wholly owned subsidiary upon completion of the transaction. Second, KKR will not be burdened by defending itself in this forum because it is a sophisticated investment firm managing approximately $757.9 billion in assets with ample access to counsel admitted in this District. Third, litigating in Utah will not conflict with the sovereignty of New York, where KKR is headquartered, or Delaware, KKR's state of incorporation. Fourth, Utah's interest in this litigation is substantial: Instructure is headquartered here, Utah residents' Data was compromised, and Utah Class Members will seek relief under Utah law. Fifth, Utah is important to Plaintiffs'

interests because Instructure is headquartered here and relevant documents and witnesses are necessarily located here. Finally, although New York or Delaware might serve as alternative forums, the existence of an alternative forum does not render Utah unreasonable where all other factors support jurisdiction. Accordingly, the tortious conduct by Defendants that gave rise to Plaintiffs' and Class Members' injuries and claims occurred in and emanated from Utah.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Instructure's principal place of business is in Utah, KKR purposefully availed itself of the benefits and protections of Utah law, and a substantial portion of the events giving rise to the claims took place in this District, including corporate decisions concerning Defendants' data security policies and practices as well as the contractual relationships with its customers.

## PARTIES

15. Defendant Instructure Holdings, Inc., formerly known as Instructure, Inc., is a Delaware corporation headquartered at 6330 South 3000 East, Suite 700, Salt Lake City, Utah 84121. On November 13, 2024, Instructure Holdings, Inc. was acquired by and became a wholly owned subsidiary of KKR & Co. Inc. Instructure is the developer, owner, and operator of the Canvas learning management system, one of the most widely used educational technology ("EdTech") platforms in the United States. Instructure serves over 30 million users and 9,000 educational institutions, encompassing approximately 40% of U.S. K-12 school districts and 50% of higher education institutions in North America.

16. Upon publicly available information and belief, Defendant Instructure, Inc. was the predecessor to Defendant Instructure Holdings, Inc., and, prior to March 2020, developed, owned, and operated Canvas. To the extent Defendant Instructure, Inc. is a distinct legal entity from Defendant Instructure Holdings, Inc., references and allegations to "Instructure" include both entities, as applicable.

17. Defendant KKR & Co. Inc. is a Delaware corporation headquartered at 30 Hudson Yards, New York, New York, 10001. KKR is one of the world's leading private-asset alternative investment firms. Since 1976, it has expanded into numerous asset classes, including private equity, credit, cybersecurity, infrastructure, energy, and real estate. It has more than forty (40) offices across four continents, more than 5,000 employees, and approximately $757.9 billion in assets under management. KKR, through its agents and/or alter egos, consummated the acquisition of Instructure in November 2024. KKR dictates Instructure's strategic directives and uses Instructure's operations, including the Canvas learning management system, to further its private-investment purposes.

18. Plaintiff Moore Public Schools ("Plaintiff," for purposes of this paragraph) is a tuition-free school district located in Oklahoma. Plaintiff serves approximately 22,700 students across its thirty-five (35) schools offering instruction from pre-kindergarten through twelfth (12th) grade. Plaintiff contracted with Instructure to utilize Canvas. As a result of Instructure's failure to implement adequate cybersecurity, Plaintiff did not receive the benefit of its bargain, has lost time and money responding to the Data Breach and

resulting outage, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Breach.

## FACTUAL BACKGROUND

### A. INSTRUCTURE COLLECTED AND ENABLED ACCESS TO THE SCHOOL DISTRICTS' PROTECTED DATA

19. Instructure is an EdTech company that owns and operates Canvas, a learning management system ("LMS") that provides services to thousands of K-12 schools, colleges, universities, and school districts for managing coursework, assignments, messaging, grading systems, and other educational records used by tens of millions of students, parents, educators, and administrators. On November 13, 2024, Instructure was acquired by KKR in a transaction valued at $4.8 billion.

20. Instructure markets Canvas as the "#1 LMS in the world," representing that the platform provides "100% uptime" and is "always on," emphasizing reliability, accessibility, and uninterrupted access to educational records and communications.[1]

21. Instructure also publishes guidance to higher educational institutions regarding how to evaluate and select an LMS. Instructure states, "[an LMS] of yesterday hosted course materials. The LMS of tomorrow adds *security*, *uptime*, native interactive video, clear data for faculty, template courses, and AI that faculty can trust and actually

[1] *Canvas by Instructure: World leading LMS for teaching & learning*, INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/canvas (last visited May 11, 2026).

use."[2] Through these representations, Instructure emphasized that cybersecurity, reliability, and data protection were essential and integrated features of the Canvas platform.

22. Instructure further markets Canvas as having a "modern, cloud-native foundation" which purportedly delivers superior "performance, security, and reliability for large, multi-campus deployments."[3] Instructure markets Canvas as superior to competing learning management systems with respect to reliability and security, describing Canvas as "cloud-native" with "validated security," compared to its competitors that are "self-hosted and Saas," "[d]epending on hosting and setup," and merely "[c]loud-hosted; enterprise grade."[4] Instructure additionally represents that, "[w]ith a sophisticated hierarchy of templates and SIS/LTI governance, Canvas keeps complex, multi-campus organizations aligned, avoiding manual governance or maintenance."[5] Through these representations, Instructure conveyed that Canvas centrally managed and governed integrations with Student Information Systems ("SIS"), user permissions, templates, and related educational

[2] *Your Higher Education Guide to Choosing a Learning Management System*, INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/resources/ebooks/your-guide-choosing-learning-management-system (last visited May 11, 2026) (emphasis added).

[3] *Canvas: The LMS Built for What's Next*, INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/resources/ebooks/canvas-lms-built-whats-next (last visited May 11, 2026).

[4] *Id.*

[5] *Id.*

data systems across institutions, thereby reducing the need for individual schools or departments to independently administer and oversee those controls manually.[6]

23. Instructure has acknowledged the importance of protecting the sensitive educational and personal information entrusted to it through Canvas. Indeed, Instructure states:

> "**<u>If student data isn't protected, the LMS loses all credibility</u>**. Strong security and clear role-based access help districts balance transparency with responsibility. With defined permissions, students, educators, administrators, and families each see the information that's relevant to them—and nothing more. This reduces risk, supports compliance, and builds trust across the learning community. Just as importantly, **<u>security should never get in the way of teaching and learning</u>**. A well-designed LMS keeps data protected in the background while instruction and communication move forward."[7]

24. Instructure also published marketing materials emphasizing that educational institutions should prioritize security, scalability, and infrastructure reliability when selecting an LMS. Indeed, Instructure justifies its higher costs and pricing structure, warning that "a less costly LMS now can create more expensive, cumbersome problems later," and advises that "[f]orward-thinking institutions should seek sustainable, scalable architecture that provides a seamless, quality experience."[8] Instructure promotes Canvas as providing "a scalable, secure, open infrastructure" fostering a "technology-friendly, data-

---

[6] *Id.*

[7] Eli Johnson, *11 Ways an LMS Supports Students, Educators, and Districts*, INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/resources/blog/11-ways-lms-supports-students-educators-districts#10.-secure-for-every-user (last visited May 11, 2026) (emphasis added).

[8] *The Cheap LMS Isn't Cheap*, INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/en-au/resources/infographic/cheap-lms-isnt-cheap (last visited May 15, 2026).

friendly culture."[9] Instructure even cites a "2019 Campus Computing CIO Survey" that emphasizes "IT data security" and "leveraging IT to support student[s]" as leading institutional technology priorities.[10]

25. Instructure additionally represented that Canvas maintained robust security infrastructure, oversight, monitoring, and operational safeguards designed to host and manage sensitive educational data at scale securely:[11]

---

[9] *Id.*
[10] *Id.*
[11] *Id.*

## Technology

| Unforeseen costs that can add up: | One clear-cut cost that covers it all: |
|---|---|
| X Servers (more students online = more servers = more money) | ✓ A multi-tenant system |
| X Additional software | ✓ Amazon Web Services, the most secure cloud-hosting service available |
| X Hardware upkeep | ✓ Seamless hosting, security, backups, and updates |
| X Security | ✓ Open APIs, resource guides, and unmatched IT support from day one |
| X Bandwidth | |
| X Poor adoption that leads to sustainability concerns | |
| **Not to Mention:** | **Not to Mention:** |
| X Development costs | ✓ Intuitive, clean user interface, easy navigation, & integrated video tools |
| X Customizations | ✓ Scalability for tens of millions of users with no up-front hardware investment |
| X Configurations | ✓ A student LMS app with an average 4.7 stars from 1.3 million ratings |
| X Consultant implementations | ✓ Simplicity and support for those new or accustomed to online teaching and learning |
| (Run your costs through the AWS TCO calculator and see where you land.) | |







26. Instructure also made extensive public representations regarding Canvas's purported security architecture, monitoring capabilities, access controls, and compliance. Through its publicly available "Trust Center," Chief Executive Officer Steve Daly ("Mr. Daly") represented that Instructure was committed to "building products that are secure and private by design" and promised customers that Instructure would "build security and privacy into all our products and all areas of our business." Indeed, Instructure's dedication

to data security and privacy professedly "begins at the highest levels of [the] organization––starting with [Mr. Daly], and [the] board."[12]

27. Similarly, Matt Kaminer, Instructure's Chief People and Legal Officer, emphasized Instructure's "rigorous [focus on] data privacy and protection," and that it holds itself "to high standards of governance and compliance," and "will protect what's entrusted to us."[13] These representations conveyed to educational institutions, students, educators, and families that Instructure maintained comprehensive and effective safeguards designed to protect sensitive educational and personal information from unauthorized access, disclosure, and misuse.

28. Instructure represented that "[s]ecurity is built into the fabric of our cloud platform, infrastructure, and processes, so you can rest assured that your data is safeguarded."[14] Instructure further represented that it maintained a "robust enterprise information security program" operating on a continuous "PDCA (Plan-Do-Check-Act) cycle" and based upon "Information Security Standards."[15] Instructure additionally represented that it maintained comprehensive policies and controls governing "all endpoints" of its production and corporate networks, including a "Network Security

---

[12] *Instructure Trust Center: Legal,* INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/trust-center/legal (last visited May 15, 2026).
[13] *Instructure Trust Center: Legal,* INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/trust-center/legal (last visited May 15, 2026).
[14] *Instructure Trust Center: Security,* INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/trust-center/security (last visited May 15, 2026).
[15] *Id.*

Policy" and an "IT Acceptable Use Policy," both of which were supposedly evaluated against "SOC 2 and ISO 27001 standards."[16]

29. Instructure also represented that its platform was hosted and managed through Amazon Web Services ("AWS") and conformed with AWS's "well-architected framework," incorporated "control plane hardening standards and benchmarks," and utilized "continuous workload monitoring." Instructure further represented that it leveraged numerous AWS security services and tools, including "AWS WAF, Shield, GuardDuty, Security Groups, KMS, and more," and maintained infrastructure using a secure "'Infrastructure as code' approach."[17]

30. Instructure additionally represented that "[a]ll data is encrypted in transit," "[a]ll data is stored at rest within encrypted volumes," and "[d]ata is replicated in real-time for your protection."[18]

31. Instructure represented that its platform is protected by a comprehensive access control framework:

> The Instructure Learning Platform is protected by a comprehensive access control framework. Access to the platform is secured by authentication, authorization, and 2FA (where applied). Access to the cloud infrastructure is protected by a comprehensive access control framework with multiple layers, including VPN, 2FA, SSH, and digital certificates. Access to our systems is granted based on principle of least privilege and need to know and supported by regular user access reviews and auditing processes.[19]

---

[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*

These statements are particularly significant given that ShinyHunters allegedly exploited weaknesses in Instructure-controlled systems and accounts associated with the "Free-for-Teacher" environment, thereby gaining unauthorized access to institutional data and user information. The Data Breach thus demonstrated that Instructure failed to adequately segregate, restrict, monitor, and govern access across various platform environments, integrations, and privileged systems, despite publicly representing that comprehensive access-control frameworks, least-privilege restrictions, and layered authentication protections were in place.

32. Instructure also represented that, "[a]s a fully hosted SaaS solution," the Canvas platform is "actively monitored by Instructure's Operations and Security teams on behalf of all customers," and that Instructure "continually monitors system usage, performance, health, and security."[20] According to Instructure, its operations teams used "internal and external industry-standard monitoring and alerting systems as well as custom alerting systems to ensure maximum coverage," and that security alerts were routed to appropriate personnel through PagerDuty.[21] Instructure further represented that it maintained "robust and considerable network and security monitoring to protect our customers and detect potential threats before they have a chance to have any impact,"

[20] *Id.*
[21] *Id.*

including through the use of AWS GuardDuty and centralized logging systems for "further analysis and alert generation."[22]

33. Instructure additionally represented that it maintained extensive compliance, auditing, and risk-management programs, including "continuous monitoring," "regular audits and assessments," "external assessments and audits conducted by independent experts," and compliance certifications and frameworks including "SOC 2 Type 2," "ISO 27001," "NIST 800-53," "TX-RAMP," "Cyber Essentials Plus," and PCI DSS-related assessments.[23] Instructure further represented that it maintained "stringent processes" to evaluate third-party risks and annually assess vendors with access to sensitive or personal data.[24] Through these statements, Instructure represented that it maintained mature governance, auditing, and risk-management structures designed to identify vulnerabilities, assess risks, monitor compliance, and protect educational data against unauthorized access and compromise.

34. Despite Instructure's extensive representations regarding security, monitoring, access controls, encryption, compliance, and risk management, the Data Breach nevertheless occurred. Instructure failed to implement, maintain, and enforce the safeguards it publicly represented as fundamental to Canvas's operation. In particular, Instructure failed to adequately secure and segregate certain platform environments; failed

---

[22] *Id.*

[23] *Instructure Trust Center: Compliance,* INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/trust-center/compliance (last visited May 15, 2026).

[24] *Id.*

to prevent unauthorized access through insufficiently controlled authentication and privileged-access pathways; and failed to detect and stop unauthorized access to, and exfiltration of, sensitive educational data in a timely manner, notwithstanding its representations concerning continuous monitoring, layered defenses, and comprehensive security governance.

35. Notably, although Instructure represented that data was encrypted in transit and at rest, the nature of the breach indicates that the stolen Data was obtained in an encrypted, readable, and usable form, demonstrating that it was not effectively protected against unauthorized access. Moreover, Instructure was well aware of prior security incidents and vulnerabilities affecting its platform and related environments, including issues associated with access pathways and legacy or auxiliary systems, yet failed to timely remediate or fully eliminate the underlying security gaps that were later exploited in the Data Breach.

36. The School Districts entrusted Instructure with highly sensitive personal information that reveals extraordinarily granular details, including the innermost thoughts and insecurities of the School Districts' students—the disclosure of which invades and infringes upon their basic privacy rights and norms, as well as the School Districts' ability to protect their students and faculty. In entering into the relevant contracts at issue, it was of utmost importance that Instructure do everything it was contractually obligated to do in order to protect this Data and maintain secure, reliable, and uninterrupted access to the Canvas platform.

## B. INSTRUCTURE FAILED TO PROTECT THE SCHOOL DISTRICTS' PROTECTED DATA

37. On April 25, 2026, the notorious data theft and extortion gang "ShinyHunters" gained unauthorized access to Instructure's Canvas platform and related systems, compromising highly sensitive educational and Private Information for over 275 million users and nearly 9,000 schools.

38. Despite Instructure's repeated public representations concerning its purportedly robust cybersecurity architecture, it failed to detect the unauthorized intrusion for approximately four days. Instructure did not identify the attack until April 29, 2026, at which point it said to have revoked the unauthorized party's access, retained outside forensic experts, and commenced an internal investigation.[25]

39. Instructure did not publicly announce the Data Breach until May 1, 2026, disclosing that they had "recently experienced a cybersecurity incident perpetrated by a criminal threat actor."[26] However, the unauthorized actors had already obtained access to substantial quantities of Private information.

40. On May 2, 2026, Instructure provided limited additional details regarding the incident, stating that it had revoked "privileged credentials and access tokens associated with affected systems," deployed security patches, rotated certain internal keys, and

[25] *Security Incident Update & FAQs*, INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/incident_update (last visited May 15, 2026).
[26] *Confirmed Security Incident*, INSTRUCTURE HOLDINGS, INC., https://status.instructure.com/incidents/9wm4knj2r64z (last visited May 15, 2026).

implemented "increased monitoring across all platforms."[27] Instructure further disclosed that the information involved in the incident included "certain identifying information of users at affected institutions, such as names, email addresses, and student ID numbers, as well as messages among users."[28] Instructure would later disclose that it believed the incident also included usernames, course named, and enrollment information.[29] The affected information is highly valuable to cybercriminals and can be readily weaponized for phishing attacks, impersonation schemes, credential attacks, identity theft, and further compromise of educational institutions and their users.

41. On May 3, 2026, Ransomware.live posted the following ransom note from ShinyHunters:

> Nearly 9,000 schools worldwide affected. 275 million individuals data ranging from students, teachers, and other staff containing PII. Several billions of private messages among students and teachers and students and other students involved, containing personal conversations and other PII. Your Salesforce instance was also breached and a lot more other data is involved. Pay or Leak. This is a final warning to reach out by 6 May 2026 before we leak along with several annoying (digital) problems that'll come your way. Make the right decision, don't be the next headline. | Size: 3.65TB+ (uncompressed) | Updated: 3 May 2026 | Warning: FINAL WARNING PAY OR LEAK[30]

---

[27] *Id*.

[28] *Id*.

[29] *Incident Fact Sheet*, INSTRUCTURE HOLDINGS, INC., May 13, 2026, https://www.instructure.com/sites/default/files/pdf/InstructurebyCanvas-Incident-Fact-Sheet-051326.pdf (last accessed May 21, 2026).

[30] *Instructure Holdings, Inc. (Canvas LMS, instructure.com)*, Ransomware.live, https://www.ransomware.live/id/SW5zdHJ1Y3R1cmUgSG9sZGluZ3MsIEluYy4gKENhbnZhIExNUywgaW5zdHJ1Y3R1cmUuY29tKUBzaGlueWh1bnRlcnM (last visited May 21, 2026).

42. Instructure did not *begin* notifying impacted organizations until May 5, 2026—more than a week after the initial intrusion and several days after first discovering the unauthorized access[31] Even then, Instructure advised that if an institution had not yet been contacted, it had "not found evidence that your data was involved," while simultaneously reiterating that the investigation remained ongoing. Thus, it is highly likely that a large number of affected School Districts remain uninformed as to whether their Data was compromised and, if so, to what extent.

43. That same day, *TechCrunch* published a report revealing that ShinyHunters had shared a sample of the stolen Data with the publication, containing messages, names, email addresses, and phone numbers from two schools in the United States.[32] *TechCrunch* also reported that ShinyHunters had provided it with a list of 8,800 school affected by the breach.

44. Also on May 5, 2026, ShinyHunters publicly asserted that Instructure "had not even bothered speaking to us" regarding the stolen Data and threatened to leak information unless ransom demands were met.[33] The gang provided a list of approximately

---

[31] *Security Incident Update & FAQs*, *supra* note 25.

[32] Lorenzo Franceschi-Bicchierai, *Hackers steal students' data during breach at education tech giant Instructure*, TechCrunch, May 5, 2026, https://techcrunch.com/2026/05/05/hackers-steal-students-data-during-breach-at-education-tech-giant-instructure/ (last accessed May 21, 2026).

[33] A.J. Vicens, *Schools reach out to Canvas hackers as breach hits US classrooms, source says*, REUTERS, May 8, 2026, https://www.reuters.com/legal/litigation/schools-reach-out-hackers-canvas-breach-hits-us-classrooms-source-says-2026-05-08/ (last visited May 15, 2026).

1,400 impacted schools and districts, inviting them to negotiate directly with the attackers to prevent public dissemination of the stolen information, thereby amplifying the fear, uncertainty, and disruption already caused by the Data Breach.[34]

45. On May 6, Instructure publicly represented that it was continuing to investigate the Data Breach. Mere minutes later, however, Instructure announced that the Data Breach was "resolved" because it was apparently not seeing "any ongoing unauthorized activity," while simultaneously issuing precautionary security recommendations for customers.[35]

## Confirmed Security Incident

Incident Report for Instructure

| | |
|---|---|
| Resolved | UPDATE - Canvas is fully operational, and we are not seeing any ongoing unauthorized activity.<br>As a precaution, we recommend customers follow security best practices, including enforcing MFA on privileged accounts, reviewing admin access, and rotating API tokens or keys where applicable.<br>This will be our final update via this status page for this incident. We will continue to provide updates as appropriate through other channels and are now communicating directly with impacted customers to provide organization-specific information and support.<br>Posted 5 days ago. May 06, 2026 - 15:15 MDT |
| Update | We are continuing to investigate this issue.<br>Posted 5 days ago. May 06, 2026 - 15:13 MDT |

[34] *Id.*

[35] *Confirmed Security Incident*, *supra* note 26.

46. These contradictory statements conveyed a false impression that the threat had been contained and that Instructure had restored the integrity and security of its systems. Instructure's purported remediation efforts proved ineffective. Indeed, on May 7, 2026 – the very next day after Instructure claimed the incident had been resolved – ShinyHunters again gained unauthorized access to Instructure's platform, proving Instructure's resolution efforts to be futile.

47. ShinyHunters posted the following message on the Canvas platform, acerbically pointing out the flaws in Instructure's post-breach discourse by announcing the second breach, and again inviting schools to negotiate directly with the gang given Instructure's indifference:




48. Instructure subsequently acknowledged that the threat actor had successfully compromised its systems for a second time, disclosing that, on May 7, 2026, it had identified "additional unauthorized activity tied to the same incident."[36] According to Instructure, the unauthorized actor "made changes to the pages that appeared when some students and teachers were logged in through Canvas."[37] Indeed, when logging into Canvas to access critical course materials, users were inextricably met with the message from

---

[36] *Security Incident Update & FAQs*, *supra* note 25.
[37] *Id.*

ShinyHunters as shown hereinabove. Instructure further admitted that it was forced to place Canvas into "maintenance mode" in order to contain the activity, investigate the incident, and apply additional safeguards.[38] In practical effect, however, placing Canvas into "maintenance mode" constituted a widespread shutdown and unavailability of the Canvas platform for students, educators, and institutions across the country that depended on Canvas during a critical academic period, thereby depriving Plaintiffs and Class Members of the continuous and reliable platform access for which they contracted for and paid substantial sums.

49. The consequences of the shutdown were immediate and severe. Educational institutions and users were unable to access coursework, assignment portals, examinations, communications, study materials, grading systems, and other core instructional functions hosted through Canvas. For example, public reporting reflects that students from Harvard University, the University of Pennsylvania, Duke University, the University of California – Los Angeles, and the University of Nebraska were reportedly blocked from using Canvas and each instead saw the message posted by ShinyHunters.[39] The incident therefore did not merely create severe cybersecurity concerns; it caused a nationwide operational paralysis across schools and universities that relied upon Canvas as an essential educational

[38] *Id*.

[39] Kurt Knutsson, *School app Canvas breach hits during finals*, FOX NEWS, May 11, 2026, https://www.foxnews.com/tech/school-app-canvas-breach-hits-during-finals (last visited May 15, 2026).

infrastructure and disrupted the precise services and operational continuity Instructure had represented it would provide.

50. The timing of the Data Breach and resulting outage substantially exacerbated the harm caused by Instructure's security and incident-response failures because the platform-wide disruption occurred during final examinations, final projects, assignment deadlines, grading periods, and end-of-semester academic activities at schools and universities nationwide. Indeed, "[s]tudents across the country [were] preparing for finals or already taking them" when Canvas became inaccessible.[40] Students and educators were suddenly unable to submit assignments, retrieve course information, review course materials, or access exams during the most academically consequential period of the semester. School administrators, faculty, and IT personnel were forced to divert substantial time and resources toward emergency response efforts, alternative testing and grading procedures, and restoring educational continuity.

51. The disruption was so significant that a number of schools were forced to postpone or cancel exams and assignments, including the University of Illinois, Penn State University, and Baylor University.[41] The disruption thus underscored the degree to which schools and universities had become dependent on Instructure's platform and its security

[40] *Id*.

[41] Rachel Treisman, *Canvas is back online, but questions – and final exam disruptions – linger*, NPR, May 8, 2026, https://www.npr.org/2026/05/08/nx-s1-5815956/canvas-data-breach-school-finals (last visited May 15, 2026).

and uptime assurances for essential instructional continuity, academic administration, grading, and communications.

52. Instructure's CEO publicly acknowledged the magnitude of the Data Breach and Instructure's deficient response, stating: "[o]ver the past few days, many of you dealt with real disruption. Stress on your teams. Missed moments in the classroom. Questions you couldn't get answered. You deserved more consistent communication from us, and we didn't deliver it. I'm sorry for that."[42] Mr. Daly further atoned, noting Instructure's decision to "get the facts right before speaking publicly" and that they "focused on fact-finding and went quiet when you needed consistent updates."[43] These statements explicitly acknowledge the inadequacy of Instructure's communications and incident-response practices during a period of acute operational and educational disruption.

53. Mr. Daly further acknowledged that Instructure "identified a vulnerability regarding support tickets in our Free for Teacher environment that was exploited," and that Instructure had "temporarily disabled Free for Teacher while [it] complete[d] a full security review."[44] Instructure further confirmed that the unauthorized actor carried out the activity "by exploiting an issue related to [its] Free-For-Teacher accounts," which Instructure acknowledged was "the same issue that led to the unauthorized access the prior week." Instructure thereafter shut down the Free-for-Teacher environment while it attempted to

[42] *Security Incident Update & FAQs*, *supra* note 25.
[43] *Id.*
[44] *Id.*

remediate the issue and implement additional safeguards.[45] Instructure subsequently decided to shut down Free-for-Teacher accounts, advising that this purportedly renders Canvas fully operational and declining to recommend "broad new customer-side remediation."[46]

54. However, Instructure's statement that shutting down the Free-for-Teacher accounts gave it "the confidence to restore access to Canvas, which is now fully back online and available for use" appeared to be yet another display of hubris and putting the cart before the horse.[47] Indeed, a number of schools were still unable to access Canvas the next day, including Penn State University, the University of California Schools, and Montgomery County Public School system in Maryland.[48] In light of Instructure's repeated premature statements, it is difficult to put any stock into their statements regarding the extent of the information compromised and overall extent of the Breach until full details come to light.

55. The circumstances surrounding the Data Breach further demonstrate material deficiencies in Instructure's publicly represented security architecture, incident-response procedures, and access controls. Specifically, Instructure admitted that the unauthorized activity was tied to vulnerabilities associated with the "Free-for-Teacher" environment and related support-ticket functionality, notwithstanding its repeated representations that

---

[45] *Id.*
[46] *Id.*
[47] Treisman, *supra* note 41.
[48] *Id.*

Canvas employed layered authentication protections, least-privilege access restrictions, continuous monitoring, reliable operational safeguards, and comprehensive governance over platform environments and integrations. The foregoing also demonstrates that Instructure failed to timely remediate known or knowable vulnerabilities even after detecting the initial intrusion *and* publicly assuring customers that the incident had been "resolved." The fact that the same threat actor was able to regain unauthorized access through the same underlying vulnerability within days of Instructure's purported remediation efforts evidences serious deficiencies in its cybersecurity safeguards, monitoring practices, incident-response protocols, and access-control procedures.

56. The United States government has likewise placed Instructure's security measures, incident-response practices, and public representations under significant scrutiny. In a letter addressed to Mr. Daly from the U.S. House of Representatives Committee on Homeland Security (for purposes of this paragraph, the "Committee"), the Committee describes the Data Breach and resulting disruptions as "a matter of national concern," and further observed that "the gap between Instructure's public characterization of this event and the scale suggested by the attacker's own claims warrants a full and transparent accounting."[49] As the Committee aptly noted:

> The recurrence of an intrusion within days of an initial breach disclosure, and Instructure's apparent failure to remediate the underlying vulnerabilities

[49] Andrew R. Garbarino, *U.S. House of Representatives Committee on Homeland Security May 11, 2026 Letter to Instructure Holdings, Inc. CEO Steve Daly*, May 11, 2026, U.S. HOUSE OF REPRESENTATIVES, https://homeland.house.gov/wp-content/uploads/2026/05/2026.05.11-Homeland-to-Instructure-Holdings-Inc.pdf (last visited May 15, 2026).

during that window, **raise serious questions about the company's incident response capabilities and its obligations to the institutions** and individuals whose data it holds.[50]

57. The U.S. Senate Committee on Health, Education, Labor, and Pensions (for purposes of this paragraph, the "Committee") has similarly called into question Instructure's data security capabilities and incident-response practices following the Data Breach, demanding answers from Mr. Daly concerning, *inter alia*, Instructure's cybersecurity protocols, its adherence to industry best practices, the timing and adequacy of its breach disclosures, and the scope of the compromised information.[51] The Committee pointedly observed that Instructure's public disclosures left material questions unanswered, noting that "[a]dditional transparency is needed regarding what information hostile actors accessed, what measures Instructure had implemented prior to the incident to protect sensitive information, and what steps the company intends to take going forward to address vulnerabilities and improve its security infrastructure."[52] Instructure's continued opacity amplifies the already-severe harms arising from the Data Breach, further undermining confidence in the company's abilities.

58. In response to mounting concerns regarding customer trust, Instructure acknowledged that the Canvas Data Breach was "the second data breach in less than a

[50] *Id*. (emphasis added).
[51] Bill Cassidy, M.D., Tommy Tuberville, *U.S. Senate Committee on Health, Education, Labor, and Pensions May 12, 2026 Letter to Instructure Holdings, Inc. CEO Steve Daly*, May 12, 2026, U.S. SENATE, https://www.help.senate.gov/imo/media/doc/letter_to_instructure_on_data_breach.pdf (last visited May 15, 2026).
[52] *Id*.

year," referencing a prior "Salesforce-related incident" involving separate systems and circumstances.[53] Instructure was therefore aware of prior security incidents, attack pathways, and risks involving its systems and hosted educational data prior to the Data Breach described herein, yet nevertheless failed to adequately remediate vulnerabilities, strengthen access restrictions, or otherwise prevent subsequent unauthorized access to sensitive educational and personal information.

59. The Data Breach exposed Plaintiffs and Class Members to an ongoing and increased risk of fraud, phishing attacks, social engineering schemes, identity theft, unauthorized account access, and misuse of confidential educational communications and records. The compromised information, including, at least, full names, email addresses, student ID numbers, and billions of private messages amongst students and educators, is precisely the type of information cybercriminals exploit to target students, families, faculty, and administrators.

60. On top of the categories of information that Instructure has confirmed were compromised, the host of additional sensitive information it collects from users remains subject to the same risks. For example, Instructure also collects and processes phone numbers, IP addresses and other device information, usernames and passwords, profile information, video images and voice recordings, submitted coursework, and in some

---

[53] *Security Incident Update & FAQs*, *supra* note 25.

instances, dates of birth and payment card information.[54] Moreover, Instructure's Student Data Privacy Agreement ("SDPA") with Plaintiff Moore Public Schools provides for collection of, *at minimum*, parent/guardian email addresses, full names, and ID numbers, student survey responses, attendance data, grade level, curriculum programs, school enrollment, teacher names, gender information, and user metadata and use of "cookies." The SDPA also expressly contemplates Instructure's collection of: student and parent/guardian addresses and phone numbers; dates of birth; places of birth; student bus pick up and/or drop off location; student bus assignment; medical alerts/health data; student disability information; and living situations. Plaintiffs and Class Members cannot reasonably rely on Instructure's assurances that such data was not similarly exposed or remains secure following the Data Breach. Moreover, the breadth and concentration of this information make Instructure an especially valuable target for threat actors and demonstrate that, absent meaningful injunctive relief and improved security controls, Plaintiffs and Class Members remain at substantial risk of future compromise, misuse of their information, and future cybersecurity incidents arising from the same deficient practices revealed by the Data Breach.

[54] *Instructure: Product Privacy Notice*, INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/policies/product-privacy-policy (last visited May 15, 2026).

### 1. Instructure Had a Duty to Follow Regulatory Guidance and Industry-Standard Cybersecurity Practices

61. The Breach and exfiltration were a direct result of Instructure's failure to comply with state and federal laws and regulations, as well as basic industry standards governing the protection of Data.

#### i. Instructure must comply with FTC guidance regarding safeguarding the School Districts' Data

62. Instructure failed to comply with Federal Trade Commission ("FTC") guidance on protecting PII and complying with industry-standard cybersecurity practices. Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, failing to use reasonable measures to protect PII by companies, like Instructure. Several publications by the FTC outline the importance of implementing reasonable security systems to protect data. To that end, the FTC recommends the following practices:

a. Limit access to customer information to only those employees who have a business reason to see it;

b. Keep customer information encrypted to provide better protection in case of theft;

c. Maintain up-to-date and appropriate programs and controls to prevent unauthorized access to customer information;

d. Use appropriate oversight and/or audit procedures to detect the improper disclosure or theft of customer information;

e. Monitor both in- and out-bound transfers of information for indications of compromise, such as large volumes of data being transmitted unexpectedly; and

f. Monitor activity logs for signs of unauthorized access to customer information.[55]

63. The FTC has also issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[56]

64. In 2016, the FTC issued a publication, Protecting PII: A Guide for Business, which established guidelines for fundamental data security principles and practices for businesses.[57] The guidelines note that businesses should protect the personal customer information they keep; properly delete PII that is no longer needed; encrypt information stored on computer networks; understand their networks' vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating that someone is attempting to hack the system or accessing

[55] Fed. Trade Comm'n, *Financial Institutions and Customer Information: Complying with the Safeguards Rule* (Apr. 2006), https://www.consumer.sc.gov/sites/consumer/files/Documents/Identity%20Theft/ftc_safeguards_rule.pdf (last visited May 15, 2026).

[56] Fed. Trade Comm'n, *Start With Security* (June 2025), http://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited May 15, 2026).

[57] Fed. Trade Comm'n, *Protecting PII: A Guide for Business*, http://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited May 15, 2026).

from an unknown location; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

65. The FTC recommends, among other things, that businesses restrict employee access to sensitive customer information; require that strong passwords be used by employees with access to sensitive customer information; apply security measures that have proven successful in the particular industry; and verify that third-parties with access to sensitive information use reasonable security measures.

66. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures that businesses must take to meet their data security obligations.

**ii. Instructure was contractually obligated to meet or exceed industry standards regarding its network security**

67. Instructure failed to comply with industry standards relating to data security, operational resiliency, monitoring, and incident response, including standards and practices that Instructure expressly represented it followed through its public-facing policies, "Trust Center" materials, and security statements, along with those expressly identified in Instructure's contracts.

68. Instructure and Plaintiff Moore Public Schools first entered into a contractual relationship for the renewal of a Canvas LMS subscription and related services on February 12, 2018. The parties extended the relationship through June 30, 2027, by executing an order form on June 10, 2025 (together with order forms between Instructure and additional Plaintiffs and Class Members, the "Order Form"). The Order Form expressly incorporates Instructure's Master Terms and Conditions and Data Processing Addendum ("DPA").

69. Instructure's Master Terms and Conditions constitute a contract of adhesion because Plaintiffs and Class Members had no opportunity to negotiate those terms and instead were required to accept them on a take-it-or-leave-it basis if they wished to utilize Canvas, one of the most widely used LMS and EdTech platforms in the United States and one that is integral to educational activities nationwide. Nonetheless, the Master Terms and Conditions set forth baseline obligations that Instructure was required to satisfy with respect to data security. Specifically, the Master Terms and Conditions expressly require Instructure to comply with all applicable laws and regulations "pertaining to personally identifiable information from records that are subject to applicable privacy laws." Moreover, Instructure's Master Terms and Conditions represent that it would implement reasonable administrative, technical, and physical safeguards in an effort to secure its facilities and systems from unauthorized access and to secure the confidentiality, integrity, availability, and accessibility of protected data and related educational services.

70. Instructure and Plaintiff Moore Public Schools also entered into a Student Data Privacy Agreement ("SDPA") on November 14, 2024 for the purpose of describing

Instructure's duties and responsibilities to protect student data. The SDPA likewise explicitly requires Instructure to "comply with all applicable federal, state, and local laws, rules, and regulations pertaining to Student Data privacy and security," "utilize administrative, physical, and technical safeguards designed to protect Student Data from unauthorized access, disclosure, acquisition, destruction, use, or modification," and "adhere to any applicable law relating to data security."

71. The SDPA with Moore Public Schools also requires Instructure to implement an adequate cybersecurity framework based on nationally recognized standards, which in this specific relationship were the NIST and ISO 27000 standards. The SDPA also contemplates adherence to additional nationally recognized cybersecurity frameworks, including NIST SP 800-53, SCF, CSC, CIS Top 20, and CMMC.

72. The SDPA further requires Instructure to provide notification to Moore Public Schools within seventy-two (72) hours of an unauthorized release of student data. The required contents of a data-breach notification included, at a minimum: (1) the name and contact information of Moore Public Schools; (2) a list of the information reasonably believed to have been compromised; (3) the date of the data breach and notice; (4) whether notification was delayed by a law-enforcement investigation; and (5) a description of the data breach. The SDPA also requires Instructure to "adhere to all federal and state requirements with respect to a data breach," including "the required responsibilities and procedures for notification and mitigation." In addition, the SDPA required Instructure to

maintain a written incident-response plan reflecting "best practices" and consistent with industry standards, federal law, and state law.

73. Instructure made extensive promises to Plaintiffs and Class Members in its representations within its Trust Center materials, Master Terms and Conditions, DPA, Product Privacy Policy, SDPAs, Network Security Policy, Acceptable IT Use Policy, Order Forms, and additional contractual agreements with Plaintiffs and Class Members (collectively, the "Contracts"). These materials were incorporated into and formed part of Instructure's contractual relationships with Plaintiffs and Class Members, including through express incorporation by reference among the governing agreements. Among other things, Instructure's Product Privacy Policy incorporated representations contained within its Trust Center materials, which in turn was incorporated into the DPA, Order Forms, and related agreements governing Instructure's handling, storage, processing, and protection of Plaintiffs' and Class Members' Data.

74. Instructure represented that it maintained a "robust enterprise information security program" evaluated against "SOC 2 and ISO 27001 standards," that it aligned with "NIST 800-53," and that security was "built into the fabric" of its cloud platform, infrastructure, and processes. Instructure further represented that it utilized continuous monitoring, layered access controls, least-privilege principles, encryption in transit and at rest, regular audits and assessments, and comprehensive governance frameworks designed to protect educational data from unauthorized access, misuse, disclosure, alteration, destruction, and disruption.

75. Instructure further represented that Canvas was a secure, reliable, and continuously available learning management system that provided “100% uptime,” was “always on,” and maintained a “modern, cloud-native foundation” designed to deliver superior “performance, security, and reliability” for educational institutions. Instructure emphasized that security, uptime, resiliency, governance, and operational continuity were core and integrated features of the Canvas platform.

76. The Contracts required that Instructure implement, *inter alia*, the following:

a. **Passwords, Authentication, and Access Controls**. Instructure was required to protect access to the Canvas platform and underlying infrastructure was through authentication, authorization, VPN protections, SSH controls, digital certificates, two-factor authentication, and role-based access restrictions grounded in least-privilege and need-to-know principles. Instructure was further required to maintain policies, procedures, and practices limiting access to customer data, conduct regular access reviews and audits, and implement technical and organizational safeguards designed to prevent unauthorized access, disclosure, alteration, and misuse of customer data. Despite these obligations, Instructure failed to adequately restrict, segment, monitor, and govern privileged access pathways and failed to prevent unauthorized access to sensitive educational data and systems.

b. **Security Monitoring and Threat Detection.** Instructure represented that it would "continually monitor[s] system usage, performance, health, and security," maintain "robust and considerable network and security monitoring," utilize "industry-standard monitoring and alerting systems," and route alerts to appropriate personnel through PagerDuty and related systems. Instructure was further required to use AWS GuardDuty, centralized logging, continuous monitoring, layered defenses, and commercially reasonable measures to identify, investigate, contain, mitigate, and remediate threats and security incidents affecting customer Data, as represented. Instructure was additionally obligated to investigate security incidents, cooperate with customers in responding to breaches, and take commercially reasonable steps to minimize resulting harm. Despite these obligations, threat actors maintained unauthorized access to Instructure-controlled systems for days without detection while exfiltrating sensitive educational Data and disrupting educational operations nationwide.

c. **Encryption and Data Protection.** Instructure was required to "adhere to any applicable law relating to data security" and "comply with all applicable federal, state, and local laws, rules, and regulations pertaining to [s]tudent Data privacy and security." Instructure was further required to encrypt all Data in transit and store all data at rest

within encrypted volumes. Instructure was further required to safeguard Data through layered security controls, cloud-native infrastructure protections, confidentiality safeguards, and organizational measures designed to prevent unauthorized or unlawful access, disclosure, destruction, loss, or alteration of customer data. Instructure additionally represented that it maintained policies and practices designed to ensure data integrity, confidentiality, and secure handling of customer information consistent with regulatory obligations and recognized privacy principles. Nevertheless, the Data Breach demonstrated that unauthorized actors were able to obtain sensitive educational records and Private Information in a readable and usable form, evidencing that Instructure failed to adequately secure such Data against unauthorized access, disclosure, and exfiltration.

d. **System Availability, Reliability, and Operational Continuity.** Instructure represented that Canvas provided "100% uptime," was "always on," and maintained scalable, resilient, and highly available infrastructure designed to ensure uninterrupted access to educational records, coursework, assignments, grading systems, messaging systems, and related educational services. Instructure further represented that it maintained governance and operational controls intended to preserve the reliability and continuity of educational

services. Instructure nevertheless failed to maintain reliable and uninterrupted access to Canvas during a critical period of final examinations and end-of-semester activities, resulting in widespread outages, shutdowns, disruptions, postponements, and cancellations affecting schools, educators, and students nationwide.

e. **Network Security and Infrastructure Hardening.** Instructure represented that its platform was hosted within AWS and incorporated "well-architected framework" principles, "control plane hardening standards and benchmarks," secure infrastructure-as-code methodologies, firewalls, security groups, workload monitoring, and layered cloud-security protections. Instructure was obligated to maintain appropriate technical, administrative, and organizational measures designed to secure customer Data and prevent unauthorized access to its systems and services. Instructure failed to adequately secure and harden its environments, systems, integrations, and access pathways, thereby permitting unauthorized access and compromise of sensitive educational systems and Data.

f. **Risk Assessments, Auditing, and Compliance Oversight.** Instructure represented that it maintained continuous monitoring, regular audits and assessments, independent external assessments, annual penetration testing, and compliance with recognized cybersecurity frameworks and

standards including SOC 2 Type II, ISO 2700, ISO 27001, NIST, NIST SP 800-53, TX-RAMP, SCF, CSC, CIS Top 20, CMMC, and related governance frameworks. Under the SDPA with Plaintiff Moore Public Schools, Instructure was required to comply with NIST and ISO 27000 standards. Instructure further represented that it maintained stringent processes to assess risks and vulnerabilities associated with third parties, subprocessors, integrations, and sensitive data access, and that it would cooperate with customer audit and data protection assessment obligations under applicable privacy laws. Had Instructure implemented and enforced reasonable risk-assessment, auditing, penetration testing, and remediation procedures consistent with its representations and industry standards, it would have identified and remediated the vulnerabilities and deficiencies exploited during the Data Breach.

g. **Role-Based Permissions and Segregation of Systems.** Instructure expressly acknowledged that educational institutions depended upon strong role-based access and permissions systems to ensure that users "see the information that's relevant to them—and nothing more." Instructure further represented that Canvas centrally governed and managed integrations, permissions, templates, and educational data systems across institutions, while maintaining safeguards designed to

limit unauthorized lateral access and preserve Data confidentiality. Despite these representations, Instructure failed to adequately segregate systems, restrict lateral access, isolate sensitive data environments, and prevent unauthorized actors from accessing institutional and user Data through interconnected systems and environments.

h. **Security Breach Management and Customer Communications.** Instructure represented that it maintained mature governance, operational oversight, and security response capabilities designed to identify, contain, mitigate, investigate, remediate, and notify customers of security incidents affecting customer Data and educational services without undue delay, with such notice to include pertinent information surrounding the details of a breach, including types of information involved, relevant dates, and law enforcement involvement. Instructure nevertheless failed to timely detect the intrusion, failed to provide prompt and complete information to schools and users regarding the scope and nature of the compromise, and prematurely represented that the incident had been resolved before additional unauthorized access and widespread operational disruptions continued to occur.

i. **Data Retention, Deletion, and Privacy Compliance.** Instructure represented that it maintained data retention and deletion policies consistent with applicable data protection laws and that customer data

would be securely returned or deleted upon request or termination of services. Instructure further represented that it adhered to recognized international privacy and data protection frameworks and maintained policies designed to ensure transparency, accountability, integrity, security, and confidentiality in its handling of customer data. Upon termination of an SDPA, Instructure was required to dispose of all student data and provide notice of such disposal to the institution. Despite these representations, Instructure failed to implement and maintain reasonable safeguards sufficient to protect the confidentiality and integrity of the sensitive educational and personal Data entrusted to it. Moreover, the monumental amount of Data and Canvas users implicated in the Data Breach evidences that Instructure failed to properly dispose of student Data.

77. As set forth herein, regardless of whether applicable industry standards, including but not limited to NIST standards, ISO 27001, 27017, 27018, SOC 2, CISA, TX-RAMP, SCF, CSC, CIS Top 20, CMMC, and Cyber Essentials Plus, or Instructure's own represented security commitments are applied, Instructure's failure to implement and enforce reasonable safeguards – including failures related to access controls, network segmentation, data encryption, continuous monitoring, threat detection, incident response, privileged-access governance, resiliency planning, and operational continuity – directly contributed to the Data Breach and resulting disruptions.

78. Under the NIST cybersecurity framework, Instructure was further obligated to have the following reasonable administrative, technical, operational and physical safeguards and practices in place:

a. Data-in-transit (motion) is encrypted;

b. Data destruction is performed according to contract and agreements;

c. A plan for vulnerability management is developed and implemented;

d. Log/audit records are ascertained, implemented, documented, and reviewed according to policy;

e. Credentials and identities are issued, verified, managed, audited, and revoked, as applicable, for authorized devices, processes, and users; and

f. Remote access is managed by Instructure and also conforms to the ISO 27001:2013 standard.

79. Relevant here, NIST standards require that organizations encrypt data both at rest and while in motion, "implement[] role-based access control and configuring it so that each user can access only the pieces of data necessary for the user's role" and "ensure that users who must access records containing PII only have access to the minimum amount of PII, along with only those privileges (*e.g.,* read, write, execute) that are necessary to perform their job duties."[58]

---

[58] Nat'l Inst. of Standards & Tech., *Guide to Protecting the Confidentiality of Personally Identifiable Information (PII): Recommendations of the National Institute of Standards and*

80. Like the NIST standard, the ISO 27001 standard focuses on establishing, implementing, maintaining, and continually improving an information security management system. Adopting ISO 27001 standards mitigates risk of unauthorized access and data breaches.[59] ISO standards recommend that companies undertake a risk assessment to determine if encryption must be used to protect the confidentiality of sensitive information and ensure that the data is accessible to those who need them when it is required.[60] ISO standards further address limiting access to sensitive data to only essential employees, implementing measures to ensure that access to data is allowed only after a verified authentication process, and implement a system to alert the organization to unauthorized access to data.[61]

81. Similarly, the SOC 2 standard is another widely recognized standard in the United States. SOC 2 compliance ensures that data is managed in a way that protects

*Technology* (Apr. 2010), https://nvlpubs.nist.gov/nistpubs/legacy/sp/nistspecialpublication800-122.pdf (last visited May 15, 2026).

[59] Int'l Org. for Standardization, *ISO/IEC 27001:2022 Information Security, Cybersecurity and Privacy Protection — Information Security Management Systems — Requirements* (2022), https://www.iso.org/standard/27001 (last visited May 15, 2026).

[60] Int'l Org. for Standardization, *ISO 27002:2022 – Control 8.24 – Use of Cryptography*, https://www.isms.online/iso-27002/control-8-24-use-of-cryptography/ (last visited May 15, 2026).

[61] Int'l Org. for Standardization, *ISO 27002:2022 – Control 8.3 – Information Access Restriction*, https://www.isms.online/iso-27002/control-8-3-information-access-restriction/ (last visited May 15, 2026).

privacy and security, requiring regular audits and controls over data access.[62] SOC 2 compliance examines whether organizations encrypt data in motion, restrict "access to information assets, including hardware, data (including during processing and in transmission), software, administrative authorities, mobile devices, output, and offline system components," and "identify and authenticate individuals who can access sensitive data and infrastructure, and segment networks and data bases and limit points of access to sensitive network segments."[63]

82. CISA guidance also encourages organizations to prevent unauthorized access by:

a. Conduct regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;

b. Regularly patch and update software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data;

c. Ensure devices are properly configured and that security features are enabled;

---

[62] *AICPA & CIMA, 2018 SOC 2 Description Criteria (With Revised Implementation Guidance – 2022)* (Oct. 1, 2023), https://www.aicpa-cima.com/resources/download/get-description-criteria-for-your-organizations-soc-2-r-report (last visited May 15, 2026).

[63] AICPA, *2017 Trust Services Criteria for Security, Availability, Processing Integrity, Confidentiality, and Privacy* (updated Mar. 2020), https://assets.ctfassets.net/rb9cdnjh59cm/72xv4p67HVXKp6CjWmjkPk/1cdbfa19f6307e2720396b66a6194dc9/trust-services-criteria-updated-copyright.pdf (last visited May 15, 2026).

d. Employ best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and

e. Disable operating system network file sharing protocol known as Server Message Block ("SMB"), which is used by threat actors to travel through a network to spread malware or access sensitive data.[64]

CISA guidance further recommends use of the principle of least privilege ("POLP") should be applied to all systems so that users only have the access they need to perform their jobs.[65]

83. CISA guidance recommends that using a comprehensive network, in addition to network segregation, will help contain the impact of an intrusion and prevent or limit lateral movement on the part of malicious actors.[66]

84. Lastly, various cybersecurity industry best practices also have been published, are readily available, and should be consulted as a go-to source for any entity instituting, developing, maintaining, or enhancing its cybersecurity standards. Additional cybersecurity best practices include, but are not limited to, installing appropriate malware detection software, monitoring and limiting network posts, securing web browsers and e-mail systems, configuring network infrastructure (like firewalls, switches, and routers),

---

[64] Multi-State Info. Sharing & Analysis Ctr., Cybersecurity & Infrastructure Sec. Agency, U.S. DEP'T OF HOMELAND SEC., *Ransomware Guide*, at 4 (Sept. 2020), https://www.cisa.gov/sites/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C_.pdf (last visited May 15, 2026).

[65] *Id.* at 6.

[66] *Id.*

safeguarding physical security systems, training staff on key cybersecurity aspects, monitoring for vulnerability alerts, and promptly detecting and addressing vulnerability alerts before exploitation by cybercriminals.

85. Not only should Instructure have had measures in place to prevent compromise in the first place, Instructure also should have properly siloed its systems. When data is properly siloed rather than maintained in a centralized database, an intruder is only able to access data to which any compromised credentials were allowed access rather than to the entire set of sensitive data. Had Instructure limited access to sensitive data sets to only essential employees, the hackers would have only been able to acquire a subset of data and not the entire data sets containing unencrypted Private Information and confidential communications at issue in the Data Breach.

86. In the event of a breach of customer data, Instructure was obligated to promptly notify Plaintiffs and Class Members, investigate and take reasonable steps to mitigate the breach, and facilitate compliance with applicable laws, including to:

a. Take steps to mitigate and remediate a data breach;
b. Notify Plaintiffs and Class Members without undue delay;
c. Provide Plaintiffs and Class Members with sufficient information to permit Plaintiffs and Class Members to make a determination as to any notification obligations under federal, state, or local laws and regulations; and

d. Cooperate with Plaintiffs and Class Members and take commercially reasonable steps to assist Plaintiffs and Class Members in an investigation of the Data Breach.

87. Upon learning of the Data Breach, Instructure substantially or entirely failed to perform these contractual obligations; rather Instructure instead:

a. Failed to timely detect and stop unauthorized access to its systems despite representing that it maintained continuous monitoring, layered defenses, centralized logging, and robust threat-detection capabilities;

b. Allowed threat actors to maintain access to systems and Data for a prolonged period while sensitive educational records and Private Information were exfiltrated;

c. Provided delayed, incomplete, inconsistent, and insufficient information to schools, educators, students, and families regarding the scope and consequences of the Data Breach;

d. Publicly represented that the incident had been resolved, only for additional unauthorized access, outages, disruptions, and operational shutdowns to continue thereafter;

e. Failed to prevent widespread disruptions to coursework, examinations, grading systems, assignments, communications, and other educational services during final examinations and end-of-semester activities;

f. Forced educational institutions nationwide to cancel, postpone, modify, or otherwise disrupt finals, coursework deadlines, grading periods, and related academic operations; and

g. Failed to adequately restore trust and operational stability, as schools and institutions continued issuing warnings and guidance to students, educators, and families regarding the ongoing risks and uncertainties arising from the Data Breach.

88. As a result of failing to meet its contractual, statutory, and common-law obligations, Plaintiffs and/or Class Members suffered actual, concrete, and ascertainable harms, including but not limited to, the following:

a. Paying inflated prices for services that were not actually provided;

b. Paying additional wages to staff members to address the Data Breach, such as overtime pay;

c. Increased workload on administrative staff for managing affected Data and addressing concerns from parents, students, and faculty;

d. Expenses for hiring cybersecurity experts to investigate the Breach;

e. Costs for cybersecurity experts to assess potential risks to students, teachers, parents, and staff;

f. Fees for cybersecurity experts to provide recommendations on securing the School Districts' Data;

g. Legal consultation costs to determine potential liability;

h. Legal expenses to understand regulatory compliance obligations;

i. Legal fees to prepare for potential lawsuits from affected individuals;

j. Expenses to transition data from Instructure to a different, more secure platform;

k. Technical support costs associated with data transfer;

l. Expenses for implementing improved security measures;

m. Lost opportunity costs from redirecting school staff to mitigate the Data Breach's impact;

n. Costs for providing continued credit monitoring and identity theft services to affected students, parents, and faculty;

o. Ongoing monitoring costs due to delayed or hidden fraudulent activity;

p. Expenses for drafting and sending notification letters/emails to affected individuals;

q. Increased costs associated with disrupted instructional planning, including the need to redesign lesson plans, reallocate academic calendars, and adjust grading timelines due to Canvas outages and system instability during critical academic periods;

r. Costs incurred from delayed or interrupted access to student coursework, submissions, and grading data, including administrative time spent reconstructing records, reconciling missing or inaccessible

assignments, and resolving disputes arising from incomplete or disrupted academic records;

s. Costs for setting up support hotlines or response teams for inquiries;

t. Costs associated with academic remediation efforts necessitated by the Data Breach, including make-up examinations, extended deadlines, alternative assessments, and additional instructional time required to address lost instructional continuity;

u. Costs associated with reputational harm and institutional response efforts, including expenditures to reassure students, parents, faculty, and the public regarding data security, system reliability, and continuity of educational services following the Data Breach;

v. Increased operational and infrastructure costs resulting from system downtime and degradation, including implementation of interim manual processes, duplicate systems, and other workarounds necessary to maintain instructional continuity and basic educational operations;

w. Administrative expenses for responding to concerns from students, teachers, parents, and faculty about the Data Breach; and

x. Other consequential damages, costs, and losses directly and proximately caused by Instructure's failure to safeguard Private Information, maintain system integrity, and provide continuous, reliable access to the Canvas platform as represented.

### 2. Instructure Failed to Encrypt Data in Motion or Rest for the School Districts

89. Instructure has represented that sensitive educational data within the Canvas platform is encrypted at rest and protected through layered security controls during storage and transmission. Nevertheless, the circumstances of the Data Breach indicate that ShinyHunters was able to obtain and exfiltrate sensitive educational records and Private Information in a readable and usable form. This demonstrates that, notwithstanding Instructure's encryption representations, the Data was accessible in a decrypted state at the time of unauthorized access.

90. When data is encrypted at rest, it means it's stored in an encrypted format on a device or server, unreadable without the decryption key. If a technical support administrator accesses that data and it becomes unencrypted, the data is no longer considered "at rest." Instead, it is now "in use" or "in process," as it's being actively accessed, processed, or viewed. The encrypted data at rest, stored securely (*e.g.*, on a database or disk), is then decrypted by the SIS when the administrator accesses it, typically using authorized credentials or a decryption key. This decryption happens in memory or within the application the administrator is using, allowing it to be read or manipulated.

91. Failing to implement encryption for data in motion is a critical point of vulnerability, as administrator (or an attacker with admin privileges) could misuse the unencrypted data. This failure directly contributed to the Data Breach.

92. Any organization that utilizes cloud storage or services should be focused on cloud security. There are specific standards and guidelines readily available to assist any organization in managing cloud security, including:

a. ISO 27017, which provides guidance for cloud security and applies the guidance of ISO 27002 to the cloud with seven additional controls; and

b. ISO 27018, which is closely related to ISO 27017, and defines privacy requirements in a cloud environment, particularly how the customer and cloud provider must protect PII.

93. Given that threat actors frequently attack cloud repositories, improved network security can help mitigate attacks. Had Instructure implemented sufficient network security protections, such as appropriate encryption Data during processing, then the Data Breach could have been prevented.

94. Instructure was aware of its obligations to protect its customers' Data before the Data Breach, yet failed to take reasonable steps to protect it from unauthorized access. Instructure also was aware of the significant repercussions if it failed to do so because Instructure collected Data from millions of students, teachers, and School Districts and it knew that this Data, if hacked, would result in injury, including to Plaintiffs and Class Members.

### 3. Instructure Failed to Implement Basic Security Controls to Protect the School Districts' Data and Detect the Breach

95. Reports indicate that ShinyHunters was able to exploit vulnerabilities associated with "Free-For-Teacher" accounts and potentially compromised API keys or third-party integrations to obtain access to user data.

96. Through these access points, ShinyHunters was able to obtain 3.65TB of Private Information associated with over 275 million users across approximately 9,000 institutions. While the full technical details of the intrusion have not been publicly confirmed, available reporting indicates that account-level or integration-level weaknesses played a central role in enabling the unauthorized access.

97. The Data Breach reflects serious deficiencies in the security controls governing externally accessible accounts and connected integrations within the Canvas ecosystem. In particular, the circumstances of the Breach suggest that protections surrounding authentication, token or key management, and third-party access pathways were not sufficient to prevent compromise once initial access was obtained.

98. Instructure has publicly emphasized the importance of strong authentication and security controls across its platform. However, the Breach indicates that these safeguards were not effectively implemented or enforced in a manner sufficient to prevent exploitation of compromised accounts or integration mechanisms even after Defendant had supposedly secured its network following the initial intrusion on April 25, 2026.

99. As a result, the Data Breach appears to have been facilitated by failures in basic cybersecurity controls, including secure authentication practices, proper management

of access credentials and API tokens, and adequate restriction of data access through user and integration pathways.

100. Instructure could have, and should have, taken steps that would have mitigated the risks from the typical and fundamental hacking tactics that resulted in this Data Breach.

**D. THE DATA BREACH WAS FORESEEABLE AND PREVENTABLE**

101. EdTech providers and student data have become frequent and well-known targets of cybercriminals, particularly given the vast quantities of sensitive personal information, educational records, and institutional data they maintain. Threat actors routinely target learning management systems, student-information systems, and related educational platforms through credential compromise, social engineering, and exploitation of weak access controls.

102. Instructure was not merely aware of these risks; it had actual, concrete notice of them. Incredibly, the Data Breach was not the first time Instructure had been the target of a cybersecurity attack, nor was it the first time Instructure had been targeted by ShinyHunters, the same threat actor behind the present Data Breach. Despite this, Instructure failed to implement appropriate remedial measures to prevent subsequent compromise, resulting in the second and third breaches just eight months later.

103. In September of 2025, Instructure was the subject of a social engineering attack where ShinyHunters gained unauthorized access to Instructure's Salesforce business

systems.[67] That attack provided ShinyHunters with familiarity regarding Instructure's security infrastructure and organizational vulnerabilities, allowing the threat actor to employ such familiarity to again target the Canvas platform just eight months later.[68] Had Instructure implemented appropriate organization-wide remedial measures and industry-standard security controls, the Data Breach would have been prevented. Instead, Instructure's exposure pattern does not encompass a single weakness within its security infrastructure, but rather signals "a series of underdefended adjacencies where trust boundaries between systems were weaker than the sensitivity of data they protected."[69]

104. Instructure therefore had concrete, actual notice of a known threat to its systems, platforms, and integrated environments *by the same threat actor.* Yet, Instructure failed to undertake known, adequate remedial efforts within a reasonable time. Instructure's repeated insouciance to known security risks ultimately enabled the Data Breach.

105. Instructure publicly acknowledged the prior incident on September 21, 2026, ironically stating that "transparency is a priority" while vaguely asserting that it had "implemented additional security measures to help prevent similar incidents in the

[67] Sean Nikkel, *Technical Advisory: ShinyHunters Breach of Instructure Canvas LMS*, BITDEFENDER, May 8, 2026, https://www.bitdefender.com/en-us/blog/businessinsights/technical-advisory-shinyhunters-breach-instructure-canvas-lms (last visited May 15, 2026).
[68] *ACTIVE THREAT NOTICE: Instructure Canvas Breach*, RED PIRANHA, https://redpiranha.net/news/shinyhunters-canvas-breach (last visited May 15, 2026).
[69] Nikkel, *supra* note 67.

future."[70] Clearly, whatever measures Instructure claims to have implemented were insufficient.

106. In the U.S. Senate Committee's recent letter to Instructure's CEO, after referencing the September 2025 incident and emphasizing that the Data Breach was "not the first time Instructure has experienced a cybersecurity incident," the Committee demanded answers and accountability regarding its response, asking "[w]hat remedial steps did Instructure take to improve its security protocols after that incident?"[71]

107. Given Instructure's concrete notice of ShinyHunters' intentions to target its platforms, Instructure was, or undoubtedly should have been, well aware of ShinyHunters' capabilities considering the threat actor's widely publicized history of targeting EdTech vendors, institutions, and other companies maintaining large repositories of sensitive data. Indeed ShinyHunters is reportedly the same threat actor responsible for prior attacks on PowerSchool and Infinite Campus, additional educational platform vendors, as well as recent attacks on universities themselves, including the University of Pennsylvania, Harvard University, and Princeton University. Moreover, ShinyHunters was likewise responsible for dozens of other massive cybersecurity attacks, including those impacting Ticketmaster, AT&T Wireless, and Microsoft, to name a few. As such, Instructure's familiarity with the threat actor was not illusory. Instructure thus should have taken steps

---

[70] *Update on Security Incident*, INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/resources/blog/security-incident-update (last visited May 15, 2026).

[71] Cassidy, Tuberville, *supra* note 51.

to prevent the Data Breach far beyond the rudimentary measures it previously employed, but failed to do so.

108. Instructure was likewise well aware that the information entrusted to it through its Canvas platform was especially valuable to cybercriminals. It is indisputable that targeting PII is a ubiquitous venture for threat actors given its lucrative value on the dark web and ability to be exploited for phishing, identity theft, and other fraudulent schemes. What's more, the educational services sector is a particularly attractive target for cybercriminals given the high, concentrated volumes of student data and the crucial role it plays in school operations. "At a time when hostile actors are increasingly using sophisticated tactics leveraging artificial intelligence, it is essential for the education technology sector to take meaningful steps to safeguard student and consumer information."[72] Instructure did not.

### E. INSTRUCTURE PAID A FUTILE RANSOM IN AN ATTEMPT TO CONTAIN THE DATS WHICH REMAINS SUBJECT TO ONGOING MISUSE BY HACKERS

109. Following the Data Breach, Instructure reported that it had engaged in communications with ShinyHunters and reached an agreement described as involving the purported deletion of stolen Data, along with veiled assurances that no Instructure customers will be extorted as a result of the Breach.[73]

[72] Cassidy, Tuberville, *supra* note 51.
[73] *Security Incident Update & FAQs*, *supra* note 25.

110. Instructure did not disclose the specific terms of such arrangement, nor whether law enforcement agencies were involved in its communications with ShinyHunters.[74]

111. Despite Instructure's assurances, the potential for future harms remains. Indeed, Instructure itself has acknowledged that "there is never complete certainty when dealing with cybercriminals"[75] and has advised its users to remain "cautious of unexpected emails or messages referencing this incident, avoid clicking suspicious links, and report anything unusual" while recommending that customers continue to monitor their Canvas environments, integrations, and administrative activity.[76]

112. Federal law enforcement guidance, including from the FBI, similarly warns that "[p]aying a ransom doesn't guarantee you or your organization will get any data back" and that "[t]he FBI does not support paying a ransom in response to a ransomware attack" in light of these ever-lingering risks and the fact that such extortion payments "encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[77]

---

[74] Qasim Nauman, *Maker of Canvas Learning Platform Strikes Deal for Hackers to Return Data*, THE NEW YORK TIMES, May 8, 2026, https://www.nytimes.com/2026/05/12/us/canvas-instructure-hackers-deal.html (last visited May 15, 2026).

[75] *Id.*

[76] *Security Incident Update & FAQs*, *supra* note 25.

[77] *Ransomware* | *Federal* Bureau *of Investigation*, https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/ransomware (last visited May 15, 2026).

113. Palo Alto Networks' Unit 42, a well-regarded cybersecurity research firm, warns that, "even if you pay the ransom, ***there's no guarantee that the cybercriminal will follow through*** on their end of the bargain. Even if your files are restored to their original state, it's possible that the perpetrator will maintain a copy of the stolen data and could potentially sell it on the dark web or use it against you in future attacks."[78]

114. The Center for Internet Security warns that once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[79] And even where companies pay for the return of data attackers often leak or sell the data regardless because there is no way to verify copies of the data are destroyed.[80]

115. These advisories underscore that, notwithstanding any reported arrangement with threat actors, the security and integrity of the exfiltrated Data cannot be assured and that the risks of phishing, credential stuffing, identity theft, impersonation, fraudulent schemes, targeted harassment, doxing, social engineering campaigns, and other misuse remain ongoing for Plaintiffs and Class Members.

[78] Jeremy Brown, *Breaking Down Ransomware Attacks*, PALO ALTO NETWORKS (May 21, 2021), at https://unit42.paloaltonetworks.com/breaking-down-ransomware-attacks/ (emphasis in original).

[79] Ransomware*: The Data Exfiltration and Double Extortion Trends, available at* https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends

[80] *Id*.

116. While, in the infancy of the Data Breach's aftermath, there is yet to be confirmation that the stolen Data has been sold on the Dark Web, such absence is far from indicative of safety. Stolen data takes time to be published – as data holds its highest value before it is sold because its utility and exclusivity are intact. In underground markets, undisclosed PII and Private Information has the greatest potential for profit only when the buyer can be confident they are the sole possessor. Once data is sold – or worse, sold multiple times – it quickly loses value, as competitors race to exploit the same credentials. This degradation in value stems from both diminishing exclusivity and increasing detection risks.

117. Selling data on the Dark Web or elsewhere creates traceability and risk. The act of transferring stolen information introduces exposure to law enforcement or countermeasures (*e.g.*, honeypots or fake buyers). For experienced actors in the "upper tier" of the underground economy, it is more profitable and less risky to exploit the data directly rather than sell it. Hence, raw data's worth lies not just in its market price, but in the potential value it holds before being diluted by risk, competition, or exposure.

118. Additionally, the underground economy operates under extreme uncertainty and dishonesty, often likened to a "market for lemons." Buyers have no way of verifying the quality or exclusivity of data before purchase. It is therefore likely that data leaked onto the Dark Web has already been drained for its resources.

119. ShinyHunters is a well-known collective of cybercriminals that has been credited with several large scale breaches going back to 2020. ShinyHunters initially began

by exfiltrating and attempting to sell stolen data but has since transitioned to using stolen data for extortion attempts and then, sometimes several years after the fact, publishing the data to anyone with internet access.

120. Accordingly, Plaintiffs and Class Members remain subject to continuing and substantial risks of harm arising from the Data Breach. These risks are not speculative but are inherent in the nature of the compromised Data and the known practices of threat actors involved in its exfiltration and potential dissemination. As a result, Plaintiffs and Class Members have suffered and will continue to suffer injury, including the need for ongoing monitoring, mitigation efforts, and responses to actual or attempted misuse of their Data.

**F. PLAINTIFFS AND CLASS MEMBERS HAVE BEEN HARMED**

121. Instructure provides subscription-based and support services that Plaintiffs and Class Members overpaid considerably for.

122. Instructure's failure to keep Plaintiffs' and Class Members' Data secure has had severe and continuing consequences. It has forced the affected School Districts to devote substantial time and resources to understanding the Breach and its impact on students and teachers, communicating known threats and risks to affected individuals, implementing temporary instructional and testing alternatives, exploring alternative means of storing and processing their Data, and ensuring that sensitive information is protected against future misuse and unauthorized access. For instance, administrators and personnel at Plaintiff Moore Public Schools were forced to extensively review the circumstances and impact of the Data Breach and employ mitigation efforts, including network testing,

communications to students, parents, and faculty, phishing attempt monitoring, comprehensive data assessments, third-party outreach, and access reviews.

123. Plaintiffs and Class Members also suffered substantial operational disruption as a result of the second unauthorized access and resulting Canvas outage, which occurred during final examinations, final projects, grading periods, and end-of-semester academic activities. Educators and administrators were unable to access coursework, examinations, grading tools, communications, and other essential educational functions, and numerous institutions were forced to postpone or cancel assignments and examinations altogether. Plaintiffs and Class Members also suffered reputational harm in addition to incurring costs associated with the Data Breach. They have suffered serious injury and face a present and imminent substantial risk of future injury, including extortion attempts and/or the consequences of misuse of their Data.

124. As a direct and proximate result of Instructure's known deficient data security practices, as well as its concealment of the same, Plaintiffs and Class Members have suffered and will continue to suffer injury.

125. Instructure was required to safeguard Plaintiffs' and Class Members' Data, maintain reasonable cybersecurity and incident-response measures, and provide reliable, uninterrupted access to Canvas, all pursuant to the Contracts, applicable laws and regulations, industry standards, Instructure's representations, and principles of equity. It did not do so. Because data privacy and security are integral and necessary components of the software product Instructure offered to Plaintiffs and Class Members, Plaintiffs and

Class Members received a product that lacked benefits they were promised, reasonably expected, and were otherwise entitled to receive under their contracts. As a result, Plaintiffs and Class Members suffered economic losses, including the difference in value between the product and services as promised and the insecure, disrupted, and deficient product and services actually received.

126. The difference in value between the product and services Instructure provided (lacking adequate data security, operational continuity, incident-response measures, and reliable platform access), and the product and services Plaintiffs and Class Members should have received (with adequate data security, incident response, uptime, and operational safeguards) is objective. If there is a difference between the market valuation of the product and services that should have been provided and the product as actually received, then all Class Members have suffered the same loss commensurate or proportional to the price paid by them or on their behalf for Canvas and related services.

127. Data security, operational continuity, reliability, incident response, and uptime are obviously material to Plaintiffs and Class Members, and they have been damaged whether or not an individual Class Member's data was actually subject to the Data Breach by overpaying for security, reliability, continuity, and support features that were inadequately implemented or altogether absent.

128. Even apart from the overpayment for Instructure's services, the stolen Data is one of the most valuable commodities on the Dark Web. Moreover, there are time lags between when data is stolen, when it is used, and when the discovery occurs that it has

been used. In some cases, data is leaked years after the initial exfiltration, demonstrating the ongoing risk that the Data at issue here will be misused.

129. Plaintiffs and Class Members will need to remain vigilant against unauthorized use of the stolen Data for years to come and must continue to devote school resources to monitoring the Data Breach and communicating with affected individuals.

130. Accordingly, Plaintiffs and Class Members seek full disgorgement of Defendants' ill-gotten gains. The revenues described in the preceding paragraphs are reflective of the dollar amounts that Defendants benefitted from on an annual basis in part due to their cost-cutting and unlawful conduct. Plaintiffs and Class Members allege that their payments to Instructure were excessive in light of Instructure's failure to deliver the functional data security and contractual support services promised under the Contracts. Plaintiffs and Class Members also seek compensatory damages for the measurable value of their Data, the cost of future protective measures, time spent remedying exposure, injunctive or equitable relief and any other damages, economic or non-economic, arising from Defendants' unlawful conduct.

## CLASS ALLEGATIONS

131. Plaintiffs bring this class action individually on behalf of themselves and on behalf of all similarly situated School Districts, including state departments of education, school districts, charter schools, and public and private schools in a nationwide class and, in the alternative, statewide subclasses, pursuant to Federal Rule of Civil Procedure 23. As described below, this action satisfies the numerosity, commonality, typicality, adequacy,

predominance, and superiority requirements of Rule 23(a), 23(b)(2), and 23(b)(3) (as well as the requirements for certification of one or more issue classes under Rule 23(c)(4)). Accordingly, Plaintiffs seek certification of the following Classes:

**NATIONWIDE CLASS**

132. Pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), as applicable, Plaintiffs seek certification of the following nationwide class:

> All School Districts in the United States that contracted with Instructure to provide Canvas learning management system ("Canvas") and related products and services.

133. The Nationwide Class asserts claims against Instructure and/or KKR for Breach of Express Contract (Count 1), Negligence (Count 2), Breach of Implied Covenant of Good Faith and Fair Dealing (Count 3), Unjust Enrichment (Count 4), and Declaratory Judgment and Injunctive Relief (Count 5).

**STATEWIDE SUBCLASSES**

134. In the alternative, Plaintiffs repeat and reiterate the Nationwide Class definition and claims on behalf of themselves and subclasses ("Statewide Subclasses" and with the Nationwide Class, the "Classes") consisting of School Districts in Oklahoma, and additional states to be named, under the laws of each respective state.

135. Excluded from the Classes are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Classes are any judicial

officers presiding over this matter, members of their immediate family, and members of their judicial staff having a financial or other beneficial interest in the outcome of this litigation.

136. **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, thousands of School Districts have been affected. All School Districts that contracted with Instructure to provide Canvas overpaid for Canvas, and a list of thousands of School Districts whose Data had been exfiltrated has been provided by ShinyHunters. The exact identities of affected School Districts are otherwise available from Defendants' records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

137. **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members. These common questions, among others, include:

a. Whether and to what extent Defendants had a duty to protect the confidentiality of the Data for Instructure's customers and former customers;

b. Whether Instructure failed to take reasonable and prudent security measures to ensure its Canvas platform and related systems were protected;

c. Whether Defendants enabled unauthorized access to institutional Data through inadequate controls governing Free-for-Teacher accounts, third-party integrations, and/or API tokens in violation of Instructure's Contracts;

d. Whether Defendants failed to adequately segregate environments and user roles within Canvas such that access pathways intended for limited or non-production use were capable of exposing institutional Data;

e. Whether Instructure failed to use reasonably available information to monitor its systems and prevent the Data Breach from happening;

f. Whether Instructure required its contractors and subcontractors to implement sufficient security measures, including the same security measures that it required for its direct employees;

g. Whether Instructure implemented MFA protection, least-privilege access controls, and adequate authentication safeguards for its administrators, contractors, and technical staff;

h. Whether Defendants knew or should have known that Canvas, its Free-for-Teacher environment, or related integration pathways were vulnerable to compromise;

i. Whether Defendants were negligent in failing to implement reasonable and adequate security procedures and practices at Instructure;

j. Whether Instructure failed to timely detect, contain, or disclose unauthorized access to Plaintiffs' and Class Members' Data;

k. Whether Instructure's incident response and communications were reasonable in light of applicable legal, regulatory, and industry standards, including federal cybersecurity guidance;

l. Whether Instructure's security measures were reasonable in light of applicable legal and regulatory requirements and industry standards, including the FTC Act;

m. Whether the Data Breach and related outages caused operational disruption during critical academic periods, including final examinations, grading periods, and end-of-semester activities, and whether Defendants' response adequately mitigated such harm;

n. Whether Instructure had any contractual obligations to provide for the security of its customers' Data;

o. Whether Instructure has complied with any contractual obligations to protect its customers' Data;

p. Whether KKR, as controlling parent and owner, exercised oversight or control over Instructure's cybersecurity governance, risk management, or incident response practices;

q. Whether Instructure failed to notify Plaintiffs and Class Members as soon as practicable and without delay after the Data Breach was discovered;

r. Whether Plaintiffs and Class Members overpaid for Instructure's services;

s. Whether Defendants' security measures for Canvas were reasonable in light of applicable legal and regulatory requirements and industry standards, including NIST, ISO frameworks, and federal cybersecurity guidance;

t. Whether Defendant's conduct resulted in or was the proximate cause of Plaintiffs' and Class Members' injuries;

u. Whether Plaintiffs and Class Members suffered damages or other losses because of Defendant's failure to protect their Data;

v. Whether Defendant should retain the money paid by Plaintiffs and Class Members to protect their Data; and

w. Whether Plaintiffs and Class Members are entitled to declaratory and injunctive relief.

138. **Typicality: Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and Class Members were subjected to the same allegedly unlawful conduct and harmed in the same way. Plaintiffs' damages and injuries are akin to those of other Class Members, and Plaintiffs seek relief consistent with the relief of the Class.

139. **Adequacy of Representation. Federal Rule of Civil Procedure 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Classes because Plaintiffs are impacted members of the Classes and are committed to pursuing this matter against Defendants to obtain relief for the Classes. Plaintiffs have no conflicts of interest with the Classes. Plaintiffs' counsel are competent and experienced in litigating

class actions, including extensive experience in data breach and data privacy litigation. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Classes' interests.

140. **Predominance & Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation also predominate over individual issues because the issues discussed in the foregoing paragraph concerning commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class-action mechanism is to permit litigation against wrongdoers even when the damages suffered by an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and Class Members may be relatively small in comparison to the burden and expense required to litigate their claims individually against Defendants, and thus individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. It would create the potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class-action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

141. **Risk of Prosecuting Separate Actions.** This case is appropriate for certification because prosecuting separate actions by individual proposed Class Members creates the risk of inconsistent adjudications and incompatible standards of conduct for Defendants.

142. **Ascertainability.** The Classes are defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within each Class. The Classes consist of School Districts that contracted for Instructure services, and class membership can be determined using Instructure's records.

143. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Classes as a whole, making injunctive relief appropriate. Injunctive relief is also necessary to uniformly protect the Class Members' Data. Plaintiffs seek prospective injunctive relief as a wholly separate remedy from any monetary relief.

144. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## CAUSES OF ACTION

### COUNT 1
### BREACH OF EXPRESS CONTRACT
### (On behalf of the Nationwide Class against Instructure)

145. Plaintiffs repeat and re-allege the factual allegations set forth hereinabove and incorporate the same as if set forth herein.

146. Plaintiffs bring this claim on behalf of the Nationwide Class under Utah law, or, in the alternative, on behalf of the Statewide Subclasses under the laws of their respective states of residence.

147. Plaintiffs, Class Members, and Instructure are parties to the Contracts. Plaintiffs and Class Members fully performed their obligations under the Contracts.

148. The Contracts set forth the terms that govern customer data provided to Instructure. This customer data includes the Data of Plaintiffs' and Class Members' administration, employees, students, and/or teachers, all of which was compromised and stolen while in the care, custody, and control of Instructure. The Contracts also describe Instructure's duties and responsibilities for handling customer data, requiring Instructure to do so in accordance with applicable law and pursuant to the terms of the Contracts.

149. Instructure breached its Contracts by, among other things:

a. Failing to safeguard the confidential, private, and sensitive Data it obtained from Plaintiffs and the Class. The Contracts require Instructure to maintain the confidentiality, privacy, and security of the customer Data. Security and confidentiality were material terms of the Contracts, including as reflected in Instructure's own representations regarding secure, cloud-native architecture, role-based, least privilege, and need-to-know access controls, and protected handling of student data. The School Districts' decision to purchase and utilize Canvas was conditioned on Instructure's reciprocal promise to safeguard the Data. The Contracts further required Instructure to maintain appropriate technical and organizational

measures to protect the confidentiality, integrity, and security of Plaintiffs' and Class Members' Data and Private Information, to regularly monitor compliance with such safeguards, and not to materially decrease the overall security of the Services during the term of the agreements. Instructure failed to comply with these obligations. The Data Breach has deprived Plaintiffs and Class Members of a benefit they reasonably expected to receive at the time the Contracts were made.

b. Failing to properly restrict and govern access to Data across Canvas environments, including insufficient segregation between institutional systems, auxiliary environments, and Free-for-Teacher or externally integrated systems, thereby permitting access pathways inconsistent with least-privilege principles and the intended scope of authorization under the Contracts. These failures permitted unauthorized processing of, disclosure of, access to, and exfiltration of the Data in contravention of Instructure's contractual obligations to prevent unauthorized or unlawful processing and access.

c. The Contracts impose limits on Instructure's access, collection, and processing of the Data, restricting Instructure to only those purposes provided for in the Contracts or consented to by Plaintiffs or Class Members. Access to the Data for any other means is limited by the Contracts to de-identified, anonymized, and/or encrypted data. The access restrictions in the Contracts prohibited Instructure from processing and using the Data without consent, and formed an essential element of the Contracts. The Contracts specifically required Instructure to protect against

unauthorized or unlawful processing, accidental or unlawful destruction, loss, alteration, damage, disclosure, or access to Plaintiffs' and Class Members' Data. The Data Breach was proximately caused by Instructure's deficient data protection practices and procedures resulting in the unauthorized access, collection, and processing of the Data. Accordingly, Instructure violated and materially breached the Contracts by allowing the unauthorized access, collection, and processing of the Data.

d. The Contracts further provide details regarding what Instructure must do to ensure its employees, agents, contractors, and subprocessors comply with the terms of the Contracts, including by maintaining the confidentiality, security, and privacy of customer data. Instructure was required, yet failed to ensure the compliance with its security measures and organizational safeguards, including those attributable to its employees, agents, vendors, contractors, and subprocessors, as it agreed to in the Contracts. These employees, agents, vendors, contractors, and subprocessors should have implemented basic procedures and safe data practices - such as MFA, data encryption, password rotation, and endpoint protection - for purposes of ensuring the privacy and security of Data under the terms of the Contracts. Instructure's failure to do so was unreasonable and inexcusable and directly caused the injuries complained of herein. Instructure's failure to ensure compliance by its agents, employees, contractors, and subprocessors, to whom Instructure provided access to customer data, also materially breached the Contracts.

e. Instructure further breached the Contracts by failing to implement and maintain reasonable access controls and security safeguards across its Canvas environment, including systems and account types that were broadly accessible to educators and users, such as Free-for-Teacher accounts, as well as systems connected through third-party integrations and application programming interfaces ("APIs"). These environments and access pathways materially expanded the attack surface for unauthorized access and were not sufficiently protected against foreseeable risks associated with credential compromise, token misuse, or unauthorized integration-based access. Instructure's failure to adequately secure these access pathways and to enforce consistent security controls across interconnected systems resulted in unauthorized access to and exfiltration of Plaintiffs' and Class Members' Data.

f. With respect to processing and use of Data in Instructure's possession, Instructure breached its Contracts. Instructure failed to perform its obligation under the Contracts concerning the processing and use of the Data, because it failed to implement reasonable security safeguards. Therefore, in failing to perform its obligations identified in the Contracts, Instructure materially breached the Contracts. The Contracts further required Instructure to cooperate with customer audit requests, provide information concerning its operational security practices and penetration testing, and provide reasonable assistance for data protection impact assessments and other privacy reviews required under applicable data protection laws. Had

Instructure implemented and enforced reasonable auditing, assessment, and remediation procedures consistent with these obligations, it would have identified and remediated the vulnerabilities exploited during the Data Breach.

g. The Contracts required Instructure to encrypt Plaintiffs' and Class Members' Data both in transit and at rest, and to implement and maintain encryption and other technical safeguards sufficient to ensure that such Data remained protected against unauthorized access, disclosure, and exfiltration even in the event of intrusion into Instructure's systems. Notwithstanding these obligations, the Data Breach demonstrates that unauthorized actors were able to access and obtain Plaintiffs' and Class Members' sensitive educational records and Private Information in a readable and usable form, reflecting a failure to properly encrypt, protect, or isolate data in transit and/or at rest, and a failure to implement effective encryption controls consistent with Instructure's contractual and security obligations.

h. In the event of a breach of customer data, Instructure also was obligated to promptly notify victims of the security incident. Upon learning of the Data Breach, Instructure substantially or entirely failed to perform these contractual obligations, including by failing to timely provide complete and accurate information regarding the scope of the breach, the categories of Data impacted, the systems affected, and the measures necessary for Plaintiffs and Class Members to mitigate ongoing harm.

i. Instructure was obligated, at a minimum, to abide by and maintain adequate data-security measures, consistent with industry standards, to protect customer data from unauthorized disclosure or acquisition by unauthorized persons. Instructure also failed to perform its data-security obligations in accordance with industry standards and regulatory guidance and failed to maintain an adequate data-security and privacy plan. Instructure's failure to perform its obligations under the Contracts, including its failure to abide by commercially reasonable, industry-standard security requirements, constituted a material breach of the Contracts.

j. In the event of a security breach, Instructure was required to investigate the incident, cooperate with Plaintiffs and Class Members in responding to the breach, and take commercially reasonable steps to mitigate the effects of the breach and minimize resulting harm. Instructure failed to take commercially reasonable mitigation measures sufficient to prevent continuing misuse, exposure, and dissemination of Plaintiffs' and Class Members' Data following the Data Breach.

150. Instructure breached the Contracts despite knowing that the Data holds substantial value and is at great risk of being targeted by hackers.

151. Plaintiffs and Class Members reasonably expected Instructure to perform its duties under the Contracts. Plaintiffs and Class Members were assured that Instructure could react in a timely and organized fashion to address the negative implications should a data breach occur. Plaintiffs and Class Members continued to perform their obligations and make payments under this reasonable belief.

152. As a direct and proximate result of Instructure's breaches of the Contracts identified herein, Plaintiffs and Class Members have suffered monetary and other damages. Those harms were foreseeable to Instructure because the Contracts expressly included the protections at issue. These losses were and remain unavoidable because they are the natural and probable consequence of Instructure's acts and omissions through which it materially breached the Contracts.

153. As a direct and proximate result of Instructure's breaches of the Contracts, Plaintiffs and Class Members were deprived of the full benefit of data security protection that was promised under the Contracts.

154. Based upon Instructure's material breaches of the Contracts, Plaintiffs and Class Members seek to recover all available general damages, special damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other damages sufficient to compensate Plaintiffs and Class Members for their injuries as permitted by law.

**COUNT 2**
**NEGLIGENCE**
**(On behalf of the Nationwide Class against Instructure and KKR)**

155. Plaintiffs repeat and re-allege the factual allegations set forth hereinabove and incorporate the same as if set forth herein.

156. Plaintiffs bring this claim on behalf of the Nationwide Class under Utah law, or in the alternative, on behalf of the Statewide Subclasses under the laws of their respective states of residence as against Instructure.

157. Plaintiffs and Class Members were required to provide sensitive Data to use Canvas, and did so pursuant to Instructure's agreement to collect, encrypt, de-identify, and safely store their Data. Defendants had full knowledge of the sensitivity of the Data and the types of harm that Plaintiffs and Class Members could and would suffer if the Data were wrongfully disclosed.

158. Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Data in their possession from being compromised, lost, stolen, accessed, or misused by unauthorized persons. Defendants also owed a duty to Plaintiffs and Class Members to refrain from accessing, viewing, and/or using unencrypted and identifiable Data. More specifically, that duty included, among other things:

a. Designing, maintaining, and testing Instructure's security systems to ensure that Plaintiffs' and Class Members' Data in their possession was properly secured and protected;

b. Implementing processes that would detect a breach of Instructure's security system in a timely manner;

c. Timely acting upon warnings and alerts, including those generated by Instructure's security systems regarding intrusion to its networks;

d. Maintaining security measures consistent with industry standards discussed herein; and

e. Deleting Data that Instructure no longer reasonably has a legitimate business purpose in retaining.

159. Defendants' duty to use reasonable care arose from several sources, including, but not limited to, the following:

a. Because of Instructure's role as one of the largest EdTech companies, Defendants were in a unique and superior position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach;

b. Defendants' duty also arose under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect Data by companies, such as Instructure.

c. Defendants' duty to Plaintiffs and Class Members also arose pursuant to state law, including but not limited to: the Utah Protection of Personal Information Act – UT ST § 13-44-101, *et seq.*; the Utah Student Data Protection Act – UT ST § 53E-9-301, *et seq.,* the Utah Consumer Privacy Act – UT ST § 13-61-101, *et seq.*, and the Oklahoma Security Breach Notification Act – OK ST T.24, § 161, *et seq*. These statutes, among others, further establish and reflect applicable standards of care governing the use and protection of data as well as data breach notifications, among other standards. Defendants' failures to adhere to these statutory obligations and baseline cybersecurity requirements constitutes further evidence of their unreasonable and negligent conduct.

d. Defendants violated Section 5 of the FTC Act and similar state consumer protection statutes by failing to use reasonable measures to protect PII/Private Information and not complying with applicable industry standards;

e. Section 5 of the FTC Act is designed to protect Plaintiffs and Class Members from the injuries complained of herein; and

f. Defendants also had a duty to safeguard the Data of Plaintiffs and Class Members and to promptly notify them of a breach pursuant to state statutes that require Instructure to reasonably safeguard sensitive Data.

160. Defendants' actions and the resulting Data Breach constitute negligence *per se* by violating these laws and standards.

161. Defendants also had common law duties to prevent foreseeable harm to Plaintiffs and Class Members. These duties existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices.

162. Instructure voluntarily solicited and accepted Plaintiffs' and/or Class Members' Data, even offering to host the Data with its business associates. Plaintiffs and Class Members relied upon Instructure, to exercise its professional judgment to safeguard that Data from unauthorized access. Plaintiffs and Class Members relied on Instructure's misrepresentations as to information uniquely in the possession of Defendants. Defendants failed to correct such statements despite knowing of their falsity.

163. Defendants' duty to implement and maintain reasonable security measures also arose as a result of the special relationship that existed between Instructure, Plaintiffs,

and Class Members. This special relationship arose because Plaintiffs and Class Members entrusted Instructure with their Data as part of the purchase of and subsequent use of services that Instructure offers as a major EdTech company. Defendants alone could have ensured that its security systems and data storage architecture was sufficient to prevent or minimize the Data Breach. The public interest will be furthered by imposing liability here as it will encourage similarly situated companies to implement reasonable and sufficient data security practices to ensure the protection of information entrusted to them. Public policy also recognizes that companies and agencies have legal and moral obligations to protect personal information with reasonable and appropriate safeguards.

164. The Data Breach would not have occurred in the absence of negligence, and under the doctrine of *res ipsa loquitur*, it gives rise to an inference that Instructure acted negligently and failed to perform its duties to Plaintiffs and Class Members – particularly in ensuring reasonable security and privacy measures were taken by its employees, agents, vendors, contractors, and subprocessors.

165. Defendants were required to provide timely, adequate, and appropriate notification of the Data Breach to Plaintiffs and Class Members. As discussed above, Plaintiffs and Class Members needed timely and effective notice so they could take appropriate measures to prevent, mitigate, or ameliorate the damage caused by Defendants' misconduct.

166. Defendants were subject to these "independent duties," untethered to any contract between Instructure, Plaintiffs, and Class Members.

167. Defendants breached these duties owed to Plaintiffs and Class Members, as described above, and thus were negligent.

168. Defendants knew that its computing systems and data storage were vulnerable to unauthorized access and targeting by hackers for the purpose of stealing and misusing the confidential Data.

169. Plaintiffs and Class Members were foreseeable victims of Defendants' inadequate data security practices, and failure to implement agreed upon protections.

170. Defendants' duty extended to protecting Plaintiffs and Class Members from the risk of foreseeable criminal conduct of third-parties, which has been recognized in situations where the actors' own conduct or misconduct exposes another to risk or defeats protections put in place to guard against such risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts §302B (1965). Defendants' failure to take proper security measures to protect the sensitive Data for Plaintiffs and Class Members created conditions conducive to a foreseeable, intentional act; namely, the unauthorized access of Plaintiffs' and Class Members' Data.

## COUNT 3
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## (On behalf of the Nationwide Class against Instructure)

171. Plaintiffs repeat and re-allege the factual allegations set forth hereinabove and incorporate same as if set forth herein.

172. Utah law implies in every contract a covenant of good faith and fair dealing, which prohibits either party from intentionally or purposefully acting to destroy, injure, or

impair the other party's right to receive the benefits of the contract's express terms. The covenant further requires parties vested with discretion in performing contractual obligations to exercise that discretion reasonably, honestly, in good faith, and consistent with the agreed common purpose and justified expectations of the contracting parties.

173. The Contracts between Plaintiffs, Class Members, and Instructure expressly and/or by necessary implication allocated to Instructure the responsibility to provide a secure and reliable educational platform capable of safeguarding sensitive student, educator, and institutional Data and maintaining reasonable operational continuity for educational functions conducted through Canvas, including compliance with industry-standard security practices, prompt detection and contain of security incidents, and timely notice to impacted parties. Data security, confidentiality, platform reliability, and responsible handling of Data were central purposes of the Contracts and encompass Plaintiffs' and Class Members' justified contractual expectations material to their decision to utilize Canvas and entrust Instructure with extensive sensitive information and educational communications.

174. Instructure was required to exercise discretion related to data security reasonably and in good faith. Instead, Instructure failed to implement and maintain reasonable safeguards for environments associated with Free-for-Teacher accounts, third-party integrations, API access pathways, and related account or authentication controls, despite the foreseeable risks associated with unauthorized access to such systems. Instructure further failed to maintain reasonable safeguards sufficient to detect, prevent,

contain, and respond to the Data Breach and resulting service disruptions in a manner consistent with Plaintiffs' and Class Members' justified expectations under the Contracts.

175. Instructure additionally failed to act consistently with the agreed common purpose of the Contracts by failing to provide the level of security, continuity, incident response, and protection of educational data and communications reasonably contemplated by Plaintiffs and Class Members. As alleged herein, the Data Breach and related disruptions interfered with coursework, examinations, grading functions, educational communications, and other core educational operations during critical academic periods, thereby depriving Plaintiffs and Class Members of the benefits reasonably expected from the Contracts.

176. Instructure's conduct was contrary to the parties' justified expectations, subverted the Contracts' core purposes of providing secure and reliable educational platform services, and unfairly interfered with Plaintiffs' and Class Members' rights to receive the Contracts' benefits.

177. As a direct and proximate result of Instructure's breaches of the implied covenant of good faith and fair dealing, Plaintiffs and Class Members suffered damages, including but not limited to overpayment for services that did not provide the level of security, reliability, and protection reasonably expected under the Contracts, costs associated with responding to the Data Breach and service disruptions, loss of the benefit of the bargain, reputational damages, and other economic and non-economic injuries.

**COUNT 4**
**UNJUST ENRICHMENT**
**(On behalf of the Nationwide Class against Instructure and KKR)**

178. Plaintiffs repeat and re-allege the factual allegations set forth herein and incorporate the same as if set forth herein.

179. Plaintiffs bring this claim on behalf of the Nationwide Class under Utah law, or in the alternative, on behalf of the Statewide Subclasses under the laws of their respective states of residence.

180. Plaintiffs bring this claim in the alternative to Count 1.

181. Defendants received monetary benefits from Plaintiffs and Class Members in the form of payments made under contracts for software services that were supposed to include adequate cybersecurity protections.

182. Defendants knowingly accepted and retained those payments while failing to provide the full scope of services promised—specifically, by underdelivering or omitting contractually required cybersecurity measures.

183. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand,

suffered as a direct and proximate result of Defendant's decision to prioritize their own profits over the requisite security and the safety of their Private Information.

184. Defendants' retention of these funds was unjust, as it resulted from fraudulent misrepresentations, omissions, and systemic concealment of material facts regarding the actual quality and security of the services provided.

185. Defendants were aware that part of the money paid to it by Plaintiffs and Class Members was intended to be applied to data security and rather than appropriately fund their data security obligations, Defendants instead directed that money to their own profits.

186. Under principles of equity and good conscience, Defendants should not be permitted to retain the financial benefits wrongfully obtained through its deceptive and wrongful conduct.

187. As a direct and proximate result, Plaintiffs and Class Members have suffered economic harm and are entitled to restitution in an amount to be determined at trial.

**COUNT 5**
**DECLARATORY AND INJUNCTIVE RELIEF**
**28 U.S.C. § 2201, *et seq.***
**(On behalf of the Nationwide Class against Instructure and KKR)**

188. Plaintiffs repeat and re-allege the factual allegations set forth herein and incorporate the same as if set forth herein.

189. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. The Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

190. An actual controversy has arisen in the wake of the Data Breach regarding Defendants KKR's and Instructure's present and prospective common-law and other duties to reasonably safeguard customer Data, and regarding Defendants' failure to maintain data-security measures that effectively protect Plaintiffs and Class Members from further breaches compromising their Data. Plaintiffs and the Class continue to suffer injury as a result of the compromise of their Data and remain at imminent risk of future compromises given the nature and quantity of the Data stored by Instructure and Defendants' repeated failure to maintain adequate data-security measures at Instructure, resulting in the Data Breach described herein.

191. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owe a legal duty to secure School Districts' Data at Instructure and to timely notify School Districts of a data breach under the common law, their Contracts with the School Districts, and Section 5 of the FTC Act;

b. Defendants continue to breach this legal duty by failing to employ reasonable measures to secure School Districts' Data at Instructure; and

c. As a result of Defendants' ongoing breach of this legal duty, Plaintiffs and Class Members remain subject to continuing and imminent risk of, among other things, extortion and litigation.

192. The Court also should issue corresponding prospective injunctive relief requiring Instructure to employ proper security protocols consistent with law and industry standards to protect School Districts' Data.

193. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Instructure. The risk of another such breach is real, immediate, and substantial. If another breach at Instructure occurs, Plaintiffs and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

194. The hardship to Plaintiffs and the Class if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another massive data breach occurs at Instructure, Plaintiffs and Class Members will likely be subjected to extortion, lawsuits, and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants already have a pre-existing legal and contractual obligation to employ such measures.

195. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Instructure, thus eliminating the additional injuries that would result to Plaintiffs and Class Members.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all Class Members of the proposed Nationwide Class and/or Statewide Subclasses, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendants as follows:

A. Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Award permanent injunctive relief to protect the highly sensitive information of Plaintiffs and Class Members;

C. Award Plaintiffs and Class Members compensatory, consequential, general, and nominal damages in an amount to be determined at trial;

D. Order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

E. Award statutory, treble, punitive, and/or exemplary damages to the extent permitted by law;

F. Grant Plaintiffs and the Classes the declaratory relief sought herein;

G. Award Plaintiffs the costs and disbursements of this action, together with reasonable attorneys' fees, costs, and expenses;

H. Award pre- and post-judgment interest at the maximum rate permitted by law; and

I. Grant such other and further relief as the Court deems just and proper.

# DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all claims so triable.

Dated: May 22, 2026

Respectfully submitted,

*/s/ Charles H. Thronson*

Charles H. Thronson (USB 3260)
**PARSONS BEHLE & LATIMER**
201 S. Main, Suite 1800
Salt Lake City, Utah 84111
Tel: (801) 532-1234
cthronson@parsonsbehle.com

James E. Cecchi
*Pro Hac Vice* Forthcoming
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
Email: jcecchi@carellabyrne.com

Jeff Ostrow
*Pro Hac Vice* Forthcoming
**KOPELOWITZ OSTROW, P.A.**
One W Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
ostrow@kolawyers.com

Gary M. Klinger
*Pro Hac Vice* Forthcoming
**MILBERG, PLLC**
227 W Monroe St, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
gklinger@milberg.com

William Shinoff
**FRANTZ LAW GROUP, APLC**
*Pro Hace Vice* Forthcoming
402 W. Broadway

San Diego, CA 92101
Tel: (855) 735-5945
Email: wshinoff@frantzlawgroup.com

*Proposed Co-Lead Counsel for the Proposed School District Class and Counsel for Plaintiffs*

Tyler S. Graden
*Pro Hac Vice Forthcoming*
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
tgraden@ktmc.com

*Additional Counsel for the Proposed School District Class and Counsel for Plaintiffs*